**NEAL & COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 93–277C.

United States Court of Federal Claims.

Sept. 30, 1996.

Rick R. DeYoung, Anchorage, AK, for plaintiff.

Carol L. Wallack, with whom were Assistant Attorney General Frank W. Hunger, David M. Cohen, and Jeanne E. Davidson, Washington, DC, for defendant. Robert W. Ferguson, United States Coast Guard, Seattle, WA, of counsel.

## OPINION

BRUGGINK, Judge.

This dispute arises out of a construction contract between plaintiff, Neal & Company, Inc. (NCI), and the United States, acting through the United States Coast Guard (CG). The matter is before the court after trial on the contractor's claim for an equitable adjustment and the recovery of monies withheld by the CG, as well as the CG's counterclaims based upon allegations of incomplete work. The contract was for the construction of a housing subdivision for personnel stationed at the United States Coast Guard base on Kodiak Island, Alaska. NCI brings this appeal pursuant to 41 U.S.C. § 609(a)(1) (1994) from the Contracting Officer's (CO) final decision denying its request for relief. After a three week trial on plaintiff's claims, a separate three day trial addressing the Government's counterclaims, post-trial briefing, and oral argument the court finds that the plain-

tiff partially prevails on a portion of its claims, and that the defendant has failed to establish its counterclaims.

## GENERAL FACTUAL BACKGROUND

During 1987 the United States Coast Guard began planning the Lake Louise Housing Project, which is phases 7 and 8 of the CG base housing on Kodiak Island, Alaska ("the project"). The project was for the construction of a subdivision consisting of thirty individual units on a hill overlooking Lake Louise. The project required the demolition of several abandoned houses and an existing roadway, excavation into the side of the hill to make room for the construction of two rows of houses on either side of a new central road, as well as installation of sewer and electrical systems, bus shelters, and a children's play area.

The project was designed by the CG Facilities Design and Construction Center (FD & CC), located in Seattle, Washington. The CG retained Roger P. Kinney of RPK Associates to perform a geotechnical[1] evaluation of the proposed site and Colleen K. Thorpe Associates to provide a concept landscape site plan. The initial geotechnical evaluation (hereafter "the Kinney Report") was submitted to the CG in October of 1987.[2] The report was used, at least in part, to design the project.

Although a geotechnical evaluation is normally conducted during the very early stages of design work, the evaluation on this project was not done until the design was 90% complete. During trial, the court heard from plaintiff's expert, M.T. Davisson, a civil engineer specializing in geotechnical and structural engineering. According to Davisson, the geotechnical evaluation should have been conducted earlier in the project's development in order to provide the CG with a greater variety of options, as well as to allow changes to be more readily incorporated. Fred Brown,[3] a geotechnical expert retained by defendant, also stated that a geotechnical analysis should be performed in the 30% completion range, and that because the analysis was conducted "near the end of their design, ... they didn't want to make major changes." Trial Transcript ("Trial Tr.") at 162–63. Fred Brown, in reference to his geotechnical evaluation of slope stability, admitted that "[t]his was a very fast project. [The CG] gave me twenty days to do it." *Id.* at 187.

The Kinney Report indicated some problems with the site. A large amount of fill material had been placed in a ravine when the site had been developed on an earlier occasion. The report concluded that the fill would not properly support the proposed residential construction. As a result, the Kinney Report suggested several alternatives: (1) removing and replacing the existing fill; (2) removing the fill and recontouring the area to compensate for its removal; (3) avoiding the specific areas of excessive fill; or (4) relocating the entire project.

The CG elected not to remove the fill and replace it with more suitable soils. Instead, a "key buttress" was designed by Shannon & Wilson and installed by NCI at the bottom of the slope.[4] Although the buttress did rectify

---

1. A "geotechnical" evaluation is the measurement of "direct properties of the soil and strengths and settlement characteristics." Trial Transcript at 22–23 (Kinney).

 Roger Kinney testified that he was originally hired to perform a "geophysical" evaluation. Kinney stated that a geophysical evaluation is not as detailed as, and lacks the in-depth analysis of a geotechnical report, and by definition, the geophysical report is based more on prediction and extrapolation than the geotechnical analysis. However, Kinney stated that, after some prodding by the CG, he signed a document that characterized itself as a "geotechnical report."

2. NCI claims that it had no knowledge of this report's existence prior to submitting its bid.

3. Fred Brown is Vice President and Managing Engineer at the geotechnical consulting firm of Shannon & Wilson, Incorporated. Shannon & Wilson was retained by the CG after the initial Kinney Report was submitted in order to obtain a second opinion. Fred Brown later became the primary geotechnical consultant for the CG on this project, and testified on behalf of the Government.

4. The buttress was placed on the slope below the sites for the units closest to the lake. The buttress acted as a sort of dam to prevent the soils from sliding down toward the lake. It was designed to be comprised of free draining soils to prevent the build up of water pressure. The buttress was suggested by Mr. Kinney in an additional soils report prepared in November of

the unstable condition of the slope, the unremoved fill was also unsuitable as the base for construction with the result that construction later involved a large amount of "overexcavation."

The solicitation was sent to prospective bidders on February 4, 1988. Tony Neal, NCI's president, supervised preparation of the company's bid.[5] The CG issued seven amendments to the solicitation specifications. Bids were submitted on April 7, 1988. NCI was the lowest bidder on the base contract, as well as all the additive work. NCI's total bid was $8,141,947. After NCI confirmed its bid, an award letter was sent on May 16, 1988. A partial notice to proceed was given on June 1, 1988, and NCI began work immediately. The initial completion date of the project was August 3, 1989. This was extended early during construction to November 14, 1989.[6]

NCI's construction plan for this project was similar to that of an assembly line, except the thirty housing units were stationary and the workers were to move along the two rows of houses. As originally intended, the different trades would follow behind each other from one house to the next, from unit one to thirty, in the order in which the work needed to be done within each unit. In other words, first the foundation was to be laid on unit one, and while that crew moved on to lay the foundation for unit two, the rough framing crew would put up the frame for unit one. Behind rough framing would come roofing, then rough-in electrical and plumbing, then dry wall, and so on. This was possible because the housing units were similar in design, allowing for repetitive tasks.

The contract required the contractor to submit for approval a Network Analysis Schedule (NAS) utilizing the critical path method (CPM).[7] Under this contract, as well as established case law, the approved NAS/CPM schedule is the tool used to monitor performance throughout the construction process and to determine scheduling delay. NCI had difficulty in obtaining the necessary CG approval. After several iterations and corrections by both the CG and NCI personnel, the NAS was finally approved by the CG approximately five weeks after NCI started working on-site, on July 6, 1988. The NAS continued to cause problems however. According to NCI, the CG was unreasonable in its demands regarding the use of the NAS throughout the project. NCI claims that CG personnel required too many updates to the NAS schedule and that this caused delay to the project. According to NCI, the CG unreasonably withheld the payment of funds because NCI had not provided an updated NAS. The CG responds that NCI failed to meet the contract requirements regarding the continuous updating of the NAS, and that any problems NCI encountered with the use

1987, but was designed by Fred Brown of Shannon & Wilson.

5. NCI was not a newcomer to federal procurement. NCI had managed several construction projects for the Government before bidding on this contract. Its most recent project was a hospital on Kodiak Island built for the CG.

6. November 14, 1989 remained the completion date throughout construction, even after numerous modification orders and some of the worst weather in Kodiak Island history. It was not until March 17, 1993, after NCI left the project and submitted claims to the contracting officer, that NCI was granted an extension of 18 calendar days for weather delay, which extended the contract completion date to December 2, 1989. NCI was not granted any other contract extension.

7. This method of scheduling is described in the following manner:

Essentially, the critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (*E.g.,* one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These later items of work are on the "critical path." A delay, or acceleration, of work along the critical path will affect the entire project. *Haney v. United States,* 230 Ct.Cl. 148, 167–68, 676 F.2d 584, 595 (1982).

of its NAS as a scheduling and billing tool were the result of NCI's own mistakes.

It is clear that the approved schedule contained severe deficiencies. The schedule did not contain manpower limitations, or "crew constraints," resulting in an unrealistic schedule.[8] As the Government's scheduling expert, Charles Adkins, testified, the lack of crew constraints resulted in the assumption that all the units could be done near the end of the project. In other words, the schedule assumed that NCI could deploy several separate crews for each particular task at the same time, allowing the units to be finished almost simultaneously. For example, the approved NAS shows the late start and late finish dates for the electrical and mechanical rough-in activities starting and ending in August of 1989 for all the units. In order to accomplish this, NCI would need 30 crews working simultaneously on all the units. This is true for several other activities, including finish activities.

The NAS is thus completely contrary to NCI's original plan and its actual manning of the job. These NAS shortcomings are also evidenced by an NCI memorandum written by Richard Lundgren, NCI's on-site foreman, to Tony Neal, dated September 28, 1989.[9] The court also finds that the plaintiff has not established that its difficulties with the NAS should be laid to the CG. The Government is not a guarantor of the NAS.

The proposed schedule was flawed from the outset, even though it reflected timely completion. Moreover, as discussed below in connection with damages, the deficiencies in the schedule also affect the ability of the court to quantify impact and delay damages.

The first modification of the contract by the CG occurred during the end of August 1988. The contract originally required NCI to install the underground electrical work and to install transformers and a sectional switchgear. This contract requirement was removed from NCI's scope of work, however. The CG contracted with Kodiak Electric Association, Inc. (KEA) to perform the work. NCI claims that KEA failed to perform its work in a timely fashion, thereby delaying NCI's progress on the project.

Excavation and construction of the concrete foundations began on August 3, 1988. NCI encountered soil unsuitable for building, requiring overexcavation on 17 of the 30 lots. Six of the 17 lots required NCI to excavate more than one foot below the specified depth in order to reach suitable soil. Unit 18, which was the worst, required removal of approximately 680 cubic yards.

This overexcavation was, under the contract, a differing site condition. CG approval was required to obtain a contract modification identifying the additional excavation and including terms for additional compensation.[10] Therefore, excavation on a particular

8. While the contract does not specifically require the inclusion of "crew restraints" in the initial NAS submittal, these crew restraints are necessary to illustrate the impact of any delay encountered utilizing the contractually required NAS updates. *See* Contract § 01310–8, ¶ 1.5.1.2.

9. The memorandum stated, in pertinent part:

[A]fter the review of the original logic and schedule ... there appears [sic] to be errors of varying degree. The error which is preeminent is a fundamental error in logic caused by the absence of appropriate resource constraints for material, labor and equipment. The effect of not having these constraints ... further implies that the project has infinite availability of all relevant resources. This is obviously not realistic....

Allocated resources have a direct bearing on the duration of each activity.... Resource leveling should be [sic] have been applied to create a schedule based upon the realities of limited resources.

The schedule does not reflect productivity adjustments and/or constraints for winter construction or rain particularly since Kodiak has annual precipitation well above the 'norm' and over 15% of the project value is in dirt work. The restraints should also be applied to major activities such as landscaping, paving and concrete work.

....

The schedule/logic was designed on a building by building basis without consideration to [sic] interrelationships....

....

In summary, there appears to be a major fundamental error in the logic of the schedule and that is the lack of resource leveling....

10. In the section dealing with earthwork and excavation for structures. the contract states:

Notify the Contracting Officer immediately in writing in the event that it becomes necessary to remove hard, soft, weak, or wet material to a depth greater than indicated and an adjust-

unit would be halted until the required modification could be obtained from Ed Greenamyer, the on-site contracting officer's representative (COR).[11] NCI complied with this contractual provision, and was at least partially compensated for the additional work, receiving $52,711.30 pursuant to Modification No. 6. The CG refused, however, to extend the contract completion date. Modification No. 6 specifically reserved NCI's right to submit an impact claim for both time and additional costs.

Despite encountering unsuitable materials, NCI completed the initial concrete work (base building footings and walls/stems) on twenty-nine of the thirty units by January 9, 1989, 132 work days, or 186 calendar days, ahead of the date shown on the NAS. In addition, NCI completed the remaining key foundation work (structural, base-building, slabs on grade) on June 1, 1989, 30 work days, or 42 calendar days, ahead of the NAS schedule.

Although NCI was ahead of schedule with regard to the particular task of laying building foundations, other items of work began to fall behind. An example was the hanging of dry-wall. The subcontractor responsible for hanging dry-wall was BEK, Inc. According to BEK's records, as of February 14, 1989, its work was already approximately 75 days behind schedule, and as of March 16, 1989, it was approximately 90 days behind. *See* BEK letter to NCI, 2/14/89; BEK letter to

NCI, 3/16/89. There is no question that this delay can be traced, at least in part, to the fact that, as the winter of 1988–89 set in, NCI encountered problems associated with the presence of water on the site. Excessive water, in conjunction with freezing temperatures, resulted in glaciation[12] over large areas. Ice covered the foundations of several units. In some cases, ice had to be removed to permit construction to continue on those units. In addition, NCI encountered "frost heave"[13] on several of the building foundations during the winter of 1988–89. By the middle of January 1989, the floor slabs of several units had already heaved as much as 1 to 3 inches, and others were cracked to varying degrees. By the end of the winter, two floor slabs and one garage slab were replaced, several cracked slabs required patching, and framing on several units was delayed awaiting the thaw.[14]

When the heave problem became apparent, the CG, citing Contract § 01012 ¶ 1.6, ordered NCI to "tent and heat" the footings and slabs to protect the soils below from freezing. It also required NCI to make all the units weather tight and provide adequate heat to ensure that the subsurface soils did not freeze.[15] At about the same time, NCI contacted Melvin Nichols at Alaska Testlab, and requested that he provide recommendations on how NCI should proceed.[16] In its March, 1989 report, Alaska Testlab concluded that NCI could continue the framing,

---

ment in contract price will be considered in accordance with "Differing Site Conditions" paragraph of the General Provisions. Contract § 02203, ¶ 3.3.

11. Greenamyer was on-site. The contracting officer was Joel Childers. He was located at the FD & CC office in Seattle, Washington.

12. Glaciation is the formation of a sheet of ice on the ground's surface which grows in size due to the continuous feeding of water.

13. "Frost heave" is a term used to describe the uplifting of a concrete footing or foundation slab which is caused by the expansion of wet soil below as it freezes. A water source is necessary in order to encourage and maintain the expansion of the soils below the foundation.

14. One foundation was so badly affected that it was necessary to remove it entirely and lay it a second time.

15. In support of its request that NCI "tent and heat" the units, the CG cited the following two contractual clauses:

Temporary heat: The contractor is responsible for all costs to maintain temporary heat, during the construction period, to protect work in progress or to protect completed work until final acceptance.

Local conditions: Consider weather conditions [and] proceed with only those portions of the work that can be undertaken safely and without adversely affecting quality. Protect ongoing and in place work.

Contract § 01012, ¶ 1.1.10; § 01012, ¶ 1.6.

16. The CG also obtained its own assessment of the situation from Fred Brown and Shannon & Wilson.

rough mechanical, rough electrical and installation of the insulation and dry-wall on units 1 through 12, 14, 15, and 18 through 28, but that NCI should not continue work on units 13, 16, 17, 29 and 30 until the natural thaw or until NCI sufficiently heated those footings and slabs to drive out the frost. The CG permitted NCI to follow these recommendations but required it to provide evidence that there was no more frost in the ground prior to initiating or continuing the framing on foundations 14 through 30.

The source of the water with which NCI had to cope is a subject of dispute. According to NCI, the water was primarily subsurface moisture—water seeping out of the sides of excavations. It alleges that this infiltration of water is contrary to contract indications. Alternatively, to the extent the water NCI encountered was surface runoff, for which it would otherwise be responsible under the contract, the water accumulated, according to NCI, as the result of a defective CG drainage design that the contractor had to implement. It contends that, by following the CG's grading plan, excess water accumulated on the surface during construction. Under either scenario—differing site condition or defective specifications—NCI claims that these factors, in conjunction with the excessive overexcavation, affected the construction schedule and resulted in delay.

In addition to its problems with water, NCI experienced other problems during the project. For example, a number of NCI's subcontractors defaulted. Two of these subcontractors had defaulted by March, 1989, seven months into the project: Denny's Plumbing, in January of 1989, and Felton Construction Company, in the beginning of March, 1989.[17] The finish carpenters, David & Sons, defaulted in May, 1989.[18] Proteam, the rough framers, dissolved in late August,

1989, although its former employees continued to work directly for NCI.

Three other subcontractors failed to complete their work on this project. The roofer, American Building Co., quit in mid-October, 1989. Roger's Contracting, responsible for taping the dry-wall and interior painting, quit the project in October, 1989. Al Hurt, the subcontractor responsible for the interior floor coverings left the project in March, 1990.

NCI also experienced financial difficulties both before and during this project. In a March, 1989 letter, NCI explained that it had taken a "severe beating" on one of its prior projects, the Dillingham Sewerage Treatment Facility Project, completed in 1988, and that it had been forced by its bank to sell assets to meet principal and interest payments on outstanding debt. During performance on this contract, NCI's primary lender, First National Bank of Alaska, froze all of its accounts, including its payroll account, due to NCI's shaky financial condition. It became necessary for NCI's surety to provide financial backing to support NCI's operations.

Whatever the causes of disruption, there is no question that NCI did not prosecute its work in accordance with its original intent.[19] By the end of March, 1990, NCI was almost five months behind schedule. Eventually NCI completed all the required work, however, and as of March 1990, it was primarily working on punch-lists compiled by the COR. These lists were long and detailed, further straining relations. In a report prepared by Thomas Scarborough, a consultant to NCI's surety, Seaboard Surety, he states that at one point there were more than 6,000 outstanding items on the lists. In a September, 1990 letter to Seaboard, the CG stated that

---

17. Felton's default caused Seaboard Surety, Felton's surety, to take over its obligations. In April, 1989, Seaboard, which was also NCI's surety, reached an agreement with NCI, under which NCI was to takeover Felton's work and Seaboard would reimburse NCI for all costs incurred in excess of Felton's contract.

18. David & Sons defaulted even before beginning its on-site work.

19. NCI excavated in the following order: 1, 2, 5, 4, 3, 6, 7, 9, 8, 10, 11, 13, 12, 14–18, 20, 19, 21, 24, 23, 22, and 25–30. In addition, the placement of the concrete footers, which follows excavation, were completed in a different sequence: 4, 5, 1–3, 11, 13, 6–8, 10, 14, 16, 9, 12, 15, 17, 19, 20, 22, 21, 18, 24, 23, and 25–30. Dry-wall for example, was hung in the following order of units: 5, 4, 3, 7, 8, 2, 1, 9, 28, 10–12, 26, 27, 6, 24, 16, 17, 25, 15, 23, 14, 13, 22, 29, 30, 20, 19, 18, and 21.

nearly 3,000 items on the final punch-list remained incomplete when NCI left the site on August 20, 1990. NCI claims that the COR's lists were excessive, and at times contained items which were inappropriate. Greenamyer, the COR, contends that the items contained in the punch-lists were genuine and appropriate.

In June, 1990, the CG sent a letter to NCI stating that it would take over the project on a staged basis, several units at a time and established final inspection dates for each unit. The CG was to take control of the last set of units on August 16, 1990.[20] On August 20, 1990, the CG informed NCI that Emerald Maintenance had been hired to complete the work which the CG considered unfinished, and NCI was told to remove its personnel and equipment from the site by the end of the day.

After leaving the project, NCI submitted several claims to the CO for its additional costs. By March, 1992, NCI had submitted four separate claims, but later submitted a total cost claim that encompassed the preceding claims. NCI claims that the modified total cost claim approach is appropriate in this instance because the CG enticed it into structuring its claim in that fashion.

After 39 modification orders the total contract amount, per the Government, was $7,897,664.07.[21] The CG has paid NCI $7,749,031.94 to date, $148,632.13 less than the contract balance. On October 1, 1992, NCI submitted its total cost claim to the CO in the amount of $6,443,175. The CO's decision of March 17, 1993, denied these claims. This amount has since been modified to $6,899,606. The final CO decision of May 3, 1993 asserted government claims based on repair or completion work that the Government alleges was prompted by NCI's alleged poor construction and delay, as well as for liquidated damages. The total amount of these Government claims, at that time, was $785,909.68.

The complaint in this action was filed on May 4, 1993. NCI seeks to recoup withholdings, and its cost overruns. The CG asserted counterclaims in its answer, but has elected not to put forth proof as to all elements. Those as to which there was no evidence were dismissed by the court during trial. The CG did pursue claims for costs associated with completion of punch-list items, inspection costs, liquidated damages, costs associated with the replacement of a damaged bathtub, and for failure to provide the proper amount of topsoil.

## DISCUSSION

Part of NCI's current demand is for recovery of the contract balance. By far the most significant claim it makes, however, is that the contract price should be adjusted to reflect the fact that its costs dramatically increased due to impact and delay attributable to the Government. That aspect of its claim is presented on a "modified total cost" basis. NCI contends that the CG agreed to such a presentation of its main claim, and that, in any event, it is impossible at this point to isolate increased direct costs attributable to government fault.

There are nine key sources of delay or disruption that NCI attributes to the CG: the CG's failure to approve changes to the NAS; deletion of the work performed by KEA; overexcavation of unsuitable soils; overzealous enforcement of compaction testing requirements; a differing site condition manifested by subsurface water; design flaws in the CG's grading plan; numerous other flaws in the building specifications; bad faith on the part of CG personnel; and overinspection. NCI concedes that the defaults of several of its subcontractors contributed to de-

20. In a letter dated August 21, 1990, the day after NCI was removed from the project, the CO stated the actual takeover date for the last group of units was August 21, 1990.

21. Included within the 39 modification orders were modifications to increase work. These increased the contract price by approximately $181,700. This was offset by approximately $426,000 in contract reductions. Of these reduc-

tions, approximately $79,000 was associated with a reduction in the scope of NCI's work, while the remaining sum, approximately $347,000, was deducted by the Government because of alleged delay (liquidated damages assessed against NCI in the amount of $280 per calendar day) and incomplete work (costs incurred by the CG in order to complete the project).

lay and disruption, and therefore "modifies" its total costs accordingly.

The Government concedes that NCI's work was inefficiently performed. It disagrees, however, as to which party is responsible for the inefficiency. It attributes most of the delay and disruption to two causes for which the contractor would be liable: the grading subcontractor's failure to timely and properly grade the site, and the defaults and poor performances of many other subcontractors or suppliers. It also challenges the contractor's assertions of differing site conditions and defective specifications. In addition, the CG contends that the water NCI encountered was primarily surface runoff from normal rainfall, which the contract specifically made the responsibility of the contractor. The water froze, it asserts, as the result of a severe winter, for which the contractor may be entitled to non-compensable, but not compensable, delay.

A. Alleged government-caused delays

*1. The Network Analysis System*

NCI contends that the CG disrupted its ability to cope with the myriad of problems on the job because it "refused to grant any time extensions to compensate for days lost due to the unsuitable soil." Plaintiff's Brief of March 11, 1996, at 6. As the court finds below, the CG should have granted some time extension for the unsuitable foundation soils. However, there is no proof that giving a limited time extension would have improved NCI's ability to cope with other problems. Even if NCI could have made up time on its schedule if it had not had to overexcavate to the extent it did, it was still ahead of schedule with respect to foundation work after that particular problem was addressed. NCI completed the initial concrete work 186 calendar days ahead of the date shown on the NAS. NCI completed the remaining foundation work 42 calendar days, ahead of the NAS schedule. If NCI's schedule was valid, then there should have been no disruption.

NCI failed to defend its proposed NAS or to provide the court with an alternate schedule to measure the impact of delay. In order to illustrate proof of delay, NCI refers to the critical path outlined in its original as-planned NAS. However, the schedule is insufficient to determine the actual critical path or to measure the impact of any delay encountered on the project due to the lack of crew constraints and other resource allocations needed for a realistic project scheduling tool. The failure to build crew and resource allocation restraints into the original NAS creates an unrealistic amount of "float," the amount of time an activity can be delayed without affecting completion of the project. To utilize the approved NAS to determine when a delayed activity realistically becomes critical would be misleading.

The CG's scheduling expert, Charles Adkins, recreated an NAS with the necessary crew and resource allocations. Adkins' "revised" NAS, based upon a five day work week, concludes that the excavation for only the first several units is on the critical path. The critical activities then become rough-in framing, and mechanical and electrical rough-in. The expected completion date for this revised or corrected schedule was April 3, 1990, almost five months longer than NCI's original NAS, and four and a half months before the CG took over the project, on August 20, 1990.

NCI failed to provide a direct rebuttal to Adkins' "revised" schedule analysis. It did, however, challenge Adkins' use of a five, as opposed to a six day work week. It was NCI's contention that it had planned to build the project on a six day, ten hour a day, work week. The original NAS was submitted and approved based on a five-day work week, however, and using a six-day work week would result in judging NCI's actual performance even more harshly, as Adkins explained. In any event, even if NCI actually planned a longer work week, it would not change Adkins' conclusions other than shortening the project's overall completion date (although it would still show a late finish). Adkins' schedule, based on a six day work week, would show the same critical path.[22]

While NCI's scheduling expert, Jeffrey Busch, contended that he had conducted a time-impact analysis to support his conclu-

---

**22.** The contractor's bid, the court notes, did not presume a six day workweek.

sions, he never offered to the court a revised as-planned schedule, with a revised critical path or new completion date. NCI did obtain an opinion in this area from Ron Majors, a principal in the firm that aided NCI in the preparation of its original NAS. Majors' conclusions tend to corroborate those of Mr. Adkins. He concluded that the addition of crew constraints resulted in removing excavation from the critical path and replacing it with mechanical rough-in after building one. Thus, the court will utilize Adkins' revised schedule in determining the project's as-planned critical path, and for measuring delay.

■ The NAS was corrected by NCI's scheduling consultant in order to add crew constraints, but even the use of a six day week reflected a time overrun, so, as Adkins explained, this discrepancy was avoided, he felt illegitimately, by showing some of the tasks as requiring less time. Adkins viewed these reductions as improper, and the court agrees. In any event, circumstances did not bear out the contractor's optimism. The NAS schedule thus never became a useful planning tool for the contractor. Because it lacked crew constraints, it lacked realistic late start and end dates. Because of the unrealistic late start and end dates, an unrealistic amount of float appeared for a too-limited number of critical-path items. Framing work, for example, that the contractor in fact planned to do immediately after foundation work, was not required, under the approved plan, to be finished until very late in the project. When the contractor later furnished crew constraints, at the CG's request, they were not tied to the original NAS. In short, NCI's complaint that the CG did not act in a timely way to respond to requests for clarification in order to update the NAS falls flat. NCI never had a useable schedule to update.

## 2. Kodiak Electric Association

■ The first CG modification to the contract came in August, 1988. It removed the electrical work from the original contract specifications. Later the CG hired KEA directly to perform that work. Neal testified that KEA failed to complete installation of the permanent underground power lines and transformers when they were needed. The evidence shows that KEA did not begin its work until January of 1989 and that it was not until October 24, 1989 that there was permanent power to the buildings. According to Mr. Neal and Mr. Busch, the project's completion was delayed because specific tasks, such as laying the road, awaited installation of permanent power. Busch stated:

> The electrical, the main permanent power, went right down the center of the road. Basically Neal & Company was prevented from doing its roadwork, its driveways, its sidewalks or anything else down that main corridor. It was prevented from being done until KEA finished their work.

Trial Tr. at 2272.

Neal also testified that the lack of permanent power prevented NCI from providing temporary heat in many of the units. Busch stated:

> [NCI] had anticipated using temporary heat with the existing boilers.
>
> In order to do that, you need permanent power. You can't hook up a little Honda generator to a boiler and then operate the system. They couldn't even get electricity into the units for lighting or anything else as of that point in time.

Trial Tr. at 2273–74 (Busch).

This, according to both Neal and Busch delayed the project significantly. Busch stated: "We could look at the daily reports for that time period beginning in September and October. It says on the daily reports, 'No heat.' Painters can't paint. Sheet rockers can't tape because they couldn't get heat into the building." Id. at 2274. The total delay claimed is 25 calendar days.

There is substantial evidence, however, that any delay in KEA's furnishing permanent power was the result of NCI's own failure to complete certain necessary tasks. Willy Krause, NCI's first construction superintendent, prepared a "conversation record" stating, "[t]he work associated with KEA underground will not commence as committed (October 12). KEA, TV and phone co. was notified. New date will be established." NCI record of telephone conversation writ-

ten by Krause, September 27, 1988. Regarding this memorandum, Krause testified at trial:

> [T]he infrastructure work to receive this work was not there, so KEA could not very well put their work in place if some of the required elements for the installation wasn't there. That was part of, I believe, of Felton Construction's contract. . . .
>
> In some cases, I remember that some of [the elements were] there. The [junction] boxes had been poured in some places. Some of the pedestals for the street lighting were there with the accessories, but the main elements to receive this work to be done by others [were] not there at that date, so we could not commit to it. [The KEA work] had to be rescheduled for a later date.

Trial Tr. at 1308–09.

Ed Greenamyer, the project COR, also testified that the change in KEA's start date was the result of construction delays. Krause informed Greenamyer, at an October 4, 1988 meeting, that the October 12 start date for KEA was no longer possible, and that a new date needed to be set. This is confirmed by Krause's written response to Greenamyer's request for confirmation to start excavation for underground electrical, stating NCI could not meet the previously agreed upon start date of October 12 and would have to delay KEA's subcontractor. This supports the Government's position that any delay in KEA's work was caused by NCI's failure to complete the necessary prerequisites to that work.[23]

The CG also contends that NCI's failure to provide adequate temporary power and temporary heat, not KEA's delay, caused the delays NCI has alleged. The contract required NCI to provide temporary power and heat on the site, and to the units, during construction.[24] Thus, the CG concludes, because NCI was responsible for providing temporary heat and power, any delays as a result of a lack of heat in the units must rest on NCI's shoulders. According to Neal and Busch, NCI had planned to provide "temporary heat" by using the boilers installed in the units with temporary oil tanks while NCI completed the installation of the permanent oil tanks below the ground's surface. It is unclear to the court how lack of permanent power could interfere with NCI's plan to use temporary oil tanks to generate power to run the boilers. If a temporary generator was inadequate, as Busch suggested, the inadequacy could be traced either to the plan to generate temporary power in that fashion or in the lack of permanent power. In the latter event, NCI would have to have proven that it shared none of the blame for KEA's delay in performance. The evidence presented does not permit such a finding.

### 3. Overexcavation

The laying of the building foundations required a significant amount of overexcavation of unsuitable soils. NCI contends this overexcavation delayed and impacted its progress by twenty days.[25] First, NCI claims that it is entitled to additional days for completion of the project because the overexcavation delayed its progress. Second, NCI claims that the CG slowed its work by not providing approvals for overexcavation in a timely fashion.[26] Finally, it is alleged that the additional excavation and the delayed CG response time caused NCI to alter its construction sequence. This had a ripple effect

---

23. NCI did not present any evidence to corroborate Mr. Neal's testimony that KEA failed to acquire the required transformers when necessary.

24. The pertinent contract sections state:

The Contractor is responsible for the provision of, connection to, and all associated usage costs and connection fees for temporary and permanent electrical power required for the construction of this contract.

The Contractor is responsible for all costs to maintain heat, during the construction period, to protect work in progress or to protect completed work until final acceptance.

Contract § 01012, ¶¶ 1.1.8, 1.1.10.

25. Although the Coast Guard eventually granted NCI an additional $52,711.30 for the unsuitable soils that it encountered, it never granted NCI any additional time for completion of the project.

26. On some units, NCI had to suspend excavation for several days while awaiting CG approval for overexcavation.

throughout the entire project and entitles NCI, it claims, to impact damages.

The CG took the position during construction that NCI was not entitled to additional days for overexcavation because NCI was on notice of the boring logs and the Kinney Report, both of which reflected the presence of unsuitable soils on the site and therefore of the possibility that overexcavation would be necessary. Thus, the argument goes, NCI should have built extra time into its construction plan.

■ The contract required any additional excavation to be addressed as a differing site condition. Thus NCI was entitled to bid on the project without assuming additional time for an unknown amount of unsuitable soil. The CG granted NCI additional monies to compensate it for excavation, which was by definition additional to the contract. Therefore, NCI has shown the existence of a differing site condition, for which it may be entitled to additional time and/or money, provided damage and causation are proven.

At trial, the Government took the position that, although overexcavation was a differing site condition, NCI had not demonstrated that its schedule was dramatically affected by it. The Government offered the testimony of its scheduling expert, Charles Adkins, who, after doing an extensive reconstruction and analysis of NCI's schedule, concluded that NCI is entitled to 7 work days, or 9 calendar days, of delay due to overexcavation on units three through five because that work actually delayed tasks critical to the project's completion. According to Mr. Adkins, the remainder of the overexcavation did not affect the

project's critical path, because at that juncture the mechanical and electrical rough-in work were the tasks critical to the project's completion.

According to the CG's expert, Fred Brown, excavation within one foot below the specified foundation depth is typical for construction projects of this type.[27] Specifically, of the 17 sites with overexcavation, 11 had less than one foot of overexcavation for a total of 246.5 cubic yards. Mr. Brown also concluded that the amount and location of the unsuitable soil did not differ significantly from that which could be anticipated from the contract documents, primarily from the Kinney Report.[28] Thus, according to the CG and Fred Brown, much of the overexcavation encountered on this project was within industry norms and foreseeable, and therefore should not have impacted the project scheduling to the extent of NCI's allegations.

■ For NCI to be entitled to the additional 20 days it claims in connection with delay due to overexcavation, however, NCI must demonstrate that the extra work performed actually delayed work on the "critical path" of the project. NCI's analysis in this regard, presented by Jeffrey Busch, provides no detail from which the court can comprehend how the 20 additional days were derived. Busch prepared an impact analysis to support NCI's claim that its construction sequence was disrupted by the overexcavation and that this disruption affected follow-on work activities. However, Mr. Busch failed to provide an adequate causal link between the disruption of the order of excavation and

27. The Shannon & Wilson Report prepared for trial, also states:

 With a basic change from the original removal/replacement concept proposed by the Kinney Report to working with and constructing in and around about 27,000 cubic yards of existing fill, peat, and ash, it is not surprising that unsuitable material was encountered on some foundation areas. *The total extra cost of the earthwork to remove and replace unsuitable material ... represents less than 0.6 percent of the total project cost, a value well within industry standards.*

 Shannon & Wilson Report, February, 1995, at 3 (emphasis added).

28. The Kinney Report refers to the excavation of fifteen test pits, of which thirteen were actually

on-site. Of these thirteen test pits, nine had "uncompacted" or "poorly compacted fill," and eight had "volcanic ash" and/or "peat," which are considered an inappropriate base for construction and were a large part of the excess materials removed. The text of the report stated that there was a ravine with a large amount of fill unsuitable for building and recommended that the CG avoid that area. In addition to the Kinney Report, logs of boring samples taken by Shannon & Wilson where included within the contract specifications themselves. This data showed that eight of the eighteen samples taken contained peat and/or ash, unsuitable for excavation.

future delays incurred during the follow-on tasks. During his trial testimony, Busch merely iterated his conclusions, which were already stated in his report. He concluded that the total contract delay should be allocated as follows: 13 calendar days for weather delays, 7 calendar days as NCI fault, 13 days for concurrent fault, and a total of 246 days attributable to the CG. These numbers are not based on any identified critical path of construction. Nor does Busch trace delays to specific causes, such as the excavation of additional unsuitable soil.

Adkins' testimony demonstrated that the overexcavation did not have an adverse "ripple" impact on the project's scheduling. He pointed out that, by the completion of the excavation and concrete work for unit seven, Proteam, the rough framer, had enough potential work ahead of it that the delay encountered during the excavation of the remaining buildings should not have affected Proteam's work performance. In other words, by the seventh building, excavation was no longer on the project's critical path. Adkins also testified that much of the sequencing disruption actually occurred during the rough framing portion of the project, i.e., beyond the period of time for which excavation was critical for the project's completion. This delay was the result of the late arrival of panels and roof trusses, and an understaffed framing subcontractor; not the result of additional excavation. In addition, the project's sequence was not significantly disrupted by the additional excavation. The lots were excavated in the following order: 1, 2, 5, 4, 3, 6, 7, 9, 8, 10, 11, 13, 12, 14–18, 20, 19, 21, 24, 23, 22, and 25–30. The concrete walls were finished in the following sequence: 4, 5, 1, 2, 7, 3, 6, 8–11, 13–15, 12, 16, 17, 20, 19, 22, 23, 18, 21, and 24–30. Adkins concluded, as this sequencing illustrates, that while the additional excavation did affect the order in which NCI completed the foundations and the concrete walls, NCI was able to maintain the general assembly line approach and it was not as significantly impacted as it has alleged. He concluded that NCI is entitled only to seven days, or nine calendar days, for delay for overexcavation.

The court finds the presentation of Charles Adkins to be more persuasive than that of Busch. Busch, limited by an original NAS that was unusable as a means of demonstrating delay or impact, did not attempt the sort of detailed reconstruction prepared by Adkins. Thus the court concludes that NCI is entitled to nine additional calendar days for delay caused by the unsuitable soils encountered during excavation, but that NCI has failed to prove by a preponderance of the evidence that the overexcavation resulted in any additional negative impact to the project's scheduling.

### 4. Differing site condition—subsurface water

Both parties agree that the presence of ponded water and glaciation hampered construction and delayed the project. The issue is, who is responsible for the extra costs incurred.

NCI alleges that excess water "seeped" in from the soils lining the sides of excavations, and when the hill was cut back to provide additional room for the second, northern, row of houses. NCI contends this was "groundwater" or "subsurface water,"[29] not surface water, and thus not its responsibility under the contract. NCI contends that this water source was unforeseeable, and thus constituted a differing site condition. It also alleges that surface water could not be properly controlled because of a defective CG design.

Defendant, on the other hand, asserts that: 1) most of the excessive water plaintiff encountered was surface runoff, the control of which was plaintiff's responsibility under the contract;[30] 2) the logs and geotechnical in-

---

**29.** The term "groundwater" as used throughout this case refers to a water table, or a relatively static underground water level, below which the soils are saturated. The terms "subsurface water" or "interflow," which were used interchangeably during trial, are used to describe the flow of water below the surface that is supplied by some source other than a ground water table.

**30.** The contract states: "[Dewatering] includes the disposal of surface water which may accumulate in open excavations, unfinished fills, or other low areas. Remove water by trenching, pumping, or other methods to prevent softening of exposed surfaces. Surface dewatering shall include the rerouting of any storm water runoff or

formation were sufficient for NCI to have foreseen the water seepage; 3) the site design was adequate to handle the water that was encountered; and, 4) the problems encountered were the result of a failure to properly grade or protect the site, and thus NCI's own responsibility.

■ Contrary to the Government's position that the water which accumulated on the site was solely the result of precipitation and was always "surface water," the court finds that the contractor is correct in that some of the water it encountered on the site was not surface water. The geology and contour of the site is such that rain water quickly penetrates a few inches into a spongy surface layer of peat and ash, or else percolates to a lower layer of peat and ash. If it flowed in these layers, it was not in hydrologic terms, ground water. Nevertheless, while such flow may not be "ground water," it is not, after it enters the ground, surface water. In any event, it did not necessarily or even likely fall as rain water on site. Most likely it was a subsurface water flow, or "interflow" originating as rainfall on the higher gradient of the hillside. As stated by Melvin Nichols of Alaska Testlab, one of plaintiff's experts: " 'groundwater' . . . implies a free water surface below which all soils are saturated. Such a distinct water table does not exist at this site." Alaska Testlab Report, "Subsurface Water Investigation," May, 1989, at 6. Yet it is also clear that not all the water on site was the direct result of on-site precipitation. The Alaska Testlab report concluded: "The *subsurface water* has a gradient in the direction of the surface drainage and reflects the amount of surface water from rain, snow, and thaw." *Id.* (emphasis added). There was testimony, supported by several video tapes, that water seeped out of the sides of open excavations. Finally, although the Kinney Report only finds "wet" soil or "water seep" in three of thirteen on-site test pits, it also supports the conclusion that water would flow beneath the surface of the ground and did, in fact, percolate out of the

natural drainage necessary." Contract § 02203, ¶ 1.6.1.

sides of excavations that cut into the path of this flow.

■ The project was situated at the base of a small hill, on top of which was a 3.3 acre marsh. It is likely that rain water collected there and infiltrated the first layer of soft, permeable ash and peat. This water then flowed downhill along the bottom of the ash and peat layer and above the less permeable glacial till and clay. This phenomenon was described by Mr. Nichols during the trial as the "bathtub effect." These layers of peat and ash were exposed during construction and excavation, allowing water to percolate into the site. While the court finds that at least a portion of the water which accumulated was from this subsurface flow, in order for NCI to recover expenses associated with this problem, NCI must first establish that this phenomenon was a differing site condition, and second, that it caused delay and impact damages.[31]

■ There are two types of differing site conditions, "type I" and "type II." Type I claims are defined generally as "subsurface or latent physical conditions at the site which differ materially from those indicated in [the] contract." Title 48 C.F.R. § 52.236–2(a)(1) (1995). A type I differing site condition requires an affirmative Government representation of some existing site condition. A type II claim requires the contractor to encounter an unknown and unusual physical condition at the site that differs materially from conditions ordinarily encountered and generally recognized as occurring in work required by the contract. 48 C.F.R. § 52.236–2(a)(2).

### a. *Type I Differing Site Condition*

■ In order to succeed on a type I claim, NCI must establish, among other things, that the contract documents affirmatively indicate or represent the subsurface conditions which form the basis of the plaintiff's claim; that the contractor acted reasonably in interpreting the contract documents to make such an official representation; and that the subsurface conditions actually encountered in fact

**31.** It is unclear whether NCI contends a type I or type II differing site condition. The court will address both.

differed materially from the subsurface conditions indicated in the same contract area. *Youngdale & Sons Constr. Co., Inc. v. United States,* 27 Fed.Cl. 516, 528 (1993).

The first step in proving that a type I differing site condition existed is to establish that the contract documents affirmatively indicated or represented the subsurface conditions upon which NCI's claims are based. *Weeks Dredging & Contracting, Inc. v. United States,* 13 Cl.Ct. 193, 219 (1987), *aff'd,* 861 F.2d 728 (Fed.Cir.1988). *See Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1581 (Fed.Cir.1987); *Pacific Alaska Contractors v. United States,* 193 Ct.Cl. 850, 869, 436 F.2d 461, 468–70 (1971). Although, where the contract is silent, a claim cannot arise, *Ragonese v. United States,* 128 Ct.Cl. 156, 159, 120 F.Supp. 768, 768–69 (1954), "contract 'indication[s]' need not be explicit or specific" so long as they provide sufficient grounds by which the contractor can justify his "expectation of latent conditions materially different from those encountered." *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984). Thus, in order to meet this requirement, NCI must prove that the CG explicitly, or implicitly, indicated within the contract documents subsurface conditions opposite to those actually encountered.

 In interpreting the bid data, the "contractor must show that it examined the contract documents and reasonably interpreted them, but it must also show that it relied on its interpretation when calculating its bid." JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 508 (3d ed.1995) (hereinafter "CIBINIC & NASH") (citing *Weeks,* 13 Cl.Ct. 193). Thus the contract indications underlying a type I differing site condition must be such as to induce "reasonable reliance by the successful bidder that subsurface conditions would be more favorable than those encountered." *Pacific Alaska,* 193 Ct.Cl. at 864 (citing *Foster Constr. Co. C.A. & Williams Bros. Co. v. United States,* 193 Ct.Cl. 587, 435 F.2d 873 (1970); *United Contractors v. United States,* 177 Ct.Cl. 151, 161–64, 368 F.2d 585, 595–97 (1966)).

 The court is required to view NCI's claim as if "this court [were] stepping 'into the shoes of a 'reasonable and prudent' contractor' to decide how 'such a contractor would act in [the plaintiff's] situation.'" *Weeks,* 13 Cl.Ct. at 219 (citing *P.J. Maffei Bldg. Wrecking Corp.,* 732 F.2d at 917, quoting *H.N. Bailey & Assoc. v. United States,* 196 Ct.Cl. 156, 163, 449 F.2d 387, 390 (1971)). With this in mind we must address the contract documents and specifications made available to the contractor before bidding to assess whether they make any direct or indirect representations as to subsurface water conditions on the site.

NCI asserts that it interpreted the boring logs and the contract specifications to indicate a lack of subsurface water on the site, and that this interpretation was reasonable. The CG, on the other hand, contends that this alleged interpretation is unreasonable given the information available to the bidders.

 The primary geotechnical evaluation report for the Lake Louise project was conducted by Roger Kinney. The Kinney Report contained information regarding the subsurface conditions of the site. Mr. Neal testified, when asked if he knew of the Kinney Report during the bid process, "we had never heard the word Kinney as associated with this job until 1989." Trial Tr. at 486. NCI's pre-bid knowledge of the project's geotechnical report is relevant because, intertwined with determining whether or not a claim meets the criteria for a differing site condition, the court must determine whether the contractor's claims are reasonable. *See Youngdale,* 27 Fed.Cl. at 528. And, as part of this analysis, the court must assess all of the information that was available to the bidders at the time of bidding, as well as the adequacy of the contractor's site investigation and bid proposal. *See id.* at 535 (stating, [s]ince "plaintiff negligently failed to review contract documents, *i.e.,* boring logs, prior to its bid, it necessarily follows that it could not have 'acted as a reasonably prudent contractor in interpreting' the same *at that time.*") (emphasis in original); *C.W. Blakeslee & Sons, Inc. v. United States,* 89 Ct.Cl. 226, 246, 1939 WL 4250 (1939) (finding plain-

tiff's failure to review information available to them precluded argument that other documents were misleading); *Appeal of Wayne Constr.*, ENGBCA 4942, 91–1 BCA ¶ 23,535, 1990 WL 191629 (November 29, 1990) (contractor could not reasonably rely on contract indications where it failed to consider information available in sieve analyses and certain exploration logs). Thus, a threshold issue in the case at bar is whether NCI's failure to obtain and consult this report was reasonable, and whether the knowledge contained within the report should be imputed to NCI.

Mr. Neal testified that the Kinney report was not at the base engineer's office with the contract documents. But this was based on the fact that David Klopp, who was given the task of evaluating the plans at the base and conducting a site evaluation, never mentioned the existence of the Kinney Report.[32] Mr. Neal further alleges that NCI did not know to specifically request a copy of the soils report because the contract specifications did not put it on notice of the existence of the report. According to Neal, it was believed that the contract provision referring to a "soils report" actually referred to the boring logs contained within the contract specifications.

The court finds that the Kinney Report was in fact transmitted to the base on February 23, 1988, and that it was available to the prospective bidders. The CG presented both documentary and testimonial evidence to support its position that the Kinney Report had in fact been available at the base for prospective bidders to inspect. Roger Lackman, a civil engineer at the Kodiak Island base at the time of this contract, testified that his office did in fact have a copy of the Kinney Report, that it was set out with the other contract specifications on a drawing board across from his desk, and that it was available to any prospective bidder. Lackman testified that he had a copy of the report as early as October, 1987, and he then received a second copy from FD & CC in February, 1988 when the project went out for bidding. A transmittal sheet, dated February 23, 1988, states that the Report was sent to the base engineer's office. CG letter, February 23, 1988.

 While the Kinney Report may not have arrived until nineteen days after the solicitation went out, it was clearly available well before bids were due. This was adequate time for NCI to inspect this document. The nineteen day delay is of little consequence because Klopp was on site and still doing bid preparation work when he video taped the location on March 15, 1988—more than two weeks after the Report was sent to the base. *See* Klopp video tape, March 15, 1988.

The court does not find Mr. Neal's explanation as to why there was no attempt to locate the Kinney Report earlier convincing. The contract specifically states:

> The soils report prepared for this contract is available for viewing at [the] Facilities Engineers Office located in the Administration Building at the main gate to the base.

Contract § 01010, ¶ 1.4.4. Neal asserts that this could be read to refer to the boring logs included within the contract specifications. Even if boring logs could be seen as a "soils report," which the court does not believe reasonable, the contract provision clearly refers to a separate document not contained within the specifications themselves. Therefore, NCI, upon a careful reading of the contract specifications, should have known of the existence of a soils report that may have provided additional information regarding the site. The court concludes that NCI was given notice of the existence of the Kinney Geotechnical Report, and that NCI is responsible for information contained in the report.

There was conflicting testimony regarding the adequacy of the bid documents and the geotechnical reports, as well as what NCI should have been able to extrapolate from them. Regarding the adequacy of the geotechnical investigations, plaintiff's expert, Melvin Nichols testified:

> demolition line and the excavation line, [and] look at the geotechnical information. . . ." Trial Tr. at 485.

---

**32.** Neal testified that Dave Klopp was tasked to "do a site investigation, . . . look at the plans, connect the plans to problems, particularly the

I don't believe that the Kinney Report is in any way adequate for the full design of the project—to show the conditions accurately so that a contractor could reasonably bid the project and be able to anticipate what the conditions he might encounter and I don't think it was adequate for the Government to be able to anticipate that either.

Trial Tr. at 1849–50; *see also* Trial Tr. at 1856–57.[33] Mr. Davisson stated that NCI could not have known of the possible unsuitable soil conditions given the boring samples included in the bid documents and a site visit.[34] NCI also points to a CG memorandum to support this assertion. In it, LT. Takasugi, the project's design engineer, stated that the "[a]dequacy of existing soils information for bidders [is] marginal, especially for a lump sum bid." CG memorandum, October 10, 1987.[35] Finally, in a letter sent by Alaska Testlab to NCI during construction of the project, Mr. Nichols stated:

First the issue of groundwater. Little reference is made in either soils report about groundwater, or soil moisture content. No distinct water table was identified in the Kinney Report. It did discuss briefly water seeps, noting such a condition on two test pits and describing a "wet" area in another. The Shannon & Wilson report showed a water table during drilling in five of 18 borings, always below six feet. There are few, if any, moisture contents of samples in either report. Neither investigation installed standpipes in an attempt to determine the static water table. It is easy to understand from this data, how a contractor could assume little or no groundwater problem exists on this site.

Alaska Testlab Letter, January 23, 1989, at 5. Thus NCI takes the position that it was reasonable to assume that there would be little or no subsurface water problem on the site.

 Boring logs may become affirmative representations by the Government of subsurface conditions. *See Youngdale,* 27 Fed.Cl. at 532 (where specifications contain boring logs, courts generally hold such logs are affirmative representations of subsurface conditions) (citing *Foster Constr. C.A. & Williams Bros. Co. v. United States,* 193 Ct.Cl. 587, 606, 435 F.2d 873, 881–82 (1970)); *United Contractors,* 177 Ct.Cl. at 165, 368 F.2d at 597–98. In this case, the court concludes that the indication of the presence of water in some of the boring holds precludes the total from appearing as an affirmative statement that there would be no water flow beneath the surface.

The contract documents contained eighteen boring logs. Eight of these boring logs indicated the presence of peat and/or ash. Five showed water. Only two samples were taken from the area of the northern row of houses—the units directly below the slope—and neither of these samples showed the presence of water. The Kinney Report showed that three of the thirteen on-site test pits indicated "wet" soil or "water seep." The report also stated that, except for isolated seepage, free groundwater was not encountered in any of the test pits at the time of excavation. It concluded that the site was not subject to flooding. However, it did warn the contractors that "[a]ll the tills, silts, and volcanic ash are susceptible to pumping if subjected to repeated wheel loads." The fact that the soils are susceptible to "pumping" indicates that the moisture content in the soil may inhibit compaction.[36]

---

33. A report prepared by Alaska Test Lab also stated, "neither investigation was designed to reveal the extent of the problem encountered. This is clear from the lack of soil moisture contents, standpipes, and narrative addressing the subsurface water issues described in this report and found by the contractor on the site." Alaska Testlab Report, "Subsurface Water Investigation," May 23, 1989, at 11–12.

34. Davisson testified that the CG's geotechnical investigation was "grossly inadequate" and that Kinney and the CG should have investigated the

wooded area on the top of the slope for a source of water and instability.

35. He went on to write, however, that "both soils consultants [Kinney & Brown] indicated that if they were contractors, they would probably be able to bid on the project given the information available." *Id.*

36. "Pumping" occurs when apparently dry soil is compacted, either mechanically with a vibrating compactor or by heavy vehicles, and water within the soil is pulled to the surface, creating mud, which cannot be compacted.

NCI contends that the limited reference to water within the boring samples and the Kinney Report, in conjunction with the absence of information regarding subsurface water was the equivalent to the CG representing that there was no water problem on the site. In addition, its expert, Mr. Davisson, testified that because neither the Kinney Report nor the Shannon & Wilson report contained an analysis of the soils' moisture content, a reasonable contractor would assume that there was a normal moisture content on site. The plaintiff contends that the quantity of water which entered the construction site through seepage was much greater than could have been expected from the contract documents. Mr. Nichols testified: "I don't think [NCI] could have anticipated what [it] found, based upon the documents that were there.... [T]hat certainly [was not] something [it] should [have] expect[ed] [or] anticipated." Trial Tr. at 1930–31.[37]

A moisture content analysis is primarily used when assessing the difficulty level of the excavation and compaction for specific soils. The court finds persuasive the testimony of Fred Brown, who testified for the Government, that a natural moisture content test was not necessary, in part because it does not indicate the presence or absence of a subsurface water flow or static groundwater table; the lack of a moisture content analysis would not lead a contractor to believe that there is no subsurface water flow on this site.

▆▆▆ While the bid documents may not have been as thorough as they could have been with respect to water conditions, the court concludes that the specifications failed to affirmatively indicate by implication, or otherwise show, the extent of subsurface water flow. As this court has stated, the differing site conditions clause cannot be invoked where "the plans and specifications do not 'show' or 'indicate' anything about the alleged unforeseen condition, *i.e.*, if they say 'nothing one way or the other about subsurface [conditions].'" *United Contractors,* 177 Ct.Cl. at 161, 368 F.2d at 595 (quoting *Ragonese,* 128 Ct.Cl. at 159, 120 F.Supp. at 769). Nor does the lack of a moisture content analysis rise to the level of an affirmative government representation that there was no subsurface flow on the site.

▆▆▆ The court notes, however, that while a contractor is not to be charged with the technical knowledge or expertise of a geologist, *Stock & Grove, Inc. v. United States,* 204 Ct.Cl. 103, 119, 493 F.2d 629, 631–32 (1974), and is therefore "not required 'to discover *hidden* subsurface conditions or those beyond the limits of an inspection appropriate to the time available,'" *Youngdale,* 27 Fed.Cl. at 533 (quoting *Foster,* 193 Ct.Cl. at 615, 435 F.2d at 888), NCI is held to the standard of a reasonably prudent contractor in deciphering the meaning of the bid data, *id.* at 534, and is presumed to have the general skills of a reasonable contractor. *See Ragonese,* 128 Ct.Cl. at 159–61, 120 F.Supp. at 768–69; *Erickson–Shaver Contracting Corp. v. United States,* 9 Cl.Ct. 302, 305–06 (1985).

Brown opined that NCI should have expected this water seep from the nature of the soils and the heavy rainfall that is normal for

---

**37.** Nichols' trial testimony was consistent with his earlier conclusions. In a letter to NCI, in January of 1989, Nichols stated:

> This has been a cold winter in Kodiak. Reportedly the ground is already frozen two to three feet deep. The native, site soils are silty, frost susceptible soils, and there seems to be considerable seeping of groundwater around the site. With additional cold weather the depth of frost will increase and the problem will worsen.
> These problems are common in Alaska, and are addressed in the soils report, *though there appears to be more ground water at the site than was identified by the exploration.*

Alaska Testlab Letter to NCI, January 25, 1989 (emphasis added). And, in a report prepared only a few months later, Nichols stated:

> Based on our visits to this site and our experience with other projects in Alaska with similar topography and climate, we are not surprised at the amount of water being encountered. However, *the soils reports and site grading and drainage plan do not appear to anticipate the volume of water that is being encountered.*

Kodiak Island.[38] In addition, Mr. Nichols, the plaintiff's own expert, stated in two documents that ground water seepage was a common problem in Alaska, and that Alaska Testlab was not surprised by the amount of water on site based on the topography and climate of Kodiak Island because water seepage is a "common [problem] in Alaska." *See also* Alaska Testlab Report, "Discussion of Surface and Subsurface Drainage," March 20, 1989, at 6 ("Based on our visits to this site and our experience with other projects in Alaska with similar topography and climate, we are not surprised at the amount of water being encountered"). Plaintiff was an Alaska contractor, and it had done work before on Kodiak Island. There is even less reason, therefore, to treat the minimal contract indications as an indication to an experienced Alaskan contractor that there would be no subsurface water seepage. Moreover, the swampy depression in which water tended to collect was immediately adjacent to the building site. A reasonable site inspection would have disclosed the presence of this area and a reasonable Alaskan contractor would have understood its implications for trapping water just upgradient from the work area.

Finally, NCI was on notice of the existence of the Kinney report. Any failure to review that document was a result of NCI's negligence. While the Kinney Report may not have provided the most thorough investigation and analysis, it did provide prospective bidders with additional information regarding the amount of permeable soil and fill on the site. The fact that the Kinney Report finds "wet" soil or "water seep" in three test pits should have provided NCI with enough information to do a more thorough pre-bid site investigation. The Kinney Report, in conjunction with the boring logs, provided the bidders with enough information to, at the very least, warn them of the possibility of

water seepage from the soft permeable ash and peat layers. In this connection, the CG offered the testimony of Fred Brown, along with an accompanying report. In that report, Brown writes:

> In summary, we believe that a locally experienced, fully knowledgeable contractor (both Neal & Felton) would be knowledgeable of the behavior characteristics of these soils and what to expect with regards to unsuitable soils, sub-arctic weather conditions (rain, snowfall, and freezing temperatures), *hillside water seepage and runoff,* and the silty frost susceptible, moisture sensitive nature of the local soils.

Shannon & Wilson Report, "Differing Site Condition Analysis," February, 1995, at 25 (emphasis supplied).

Even NCI's expert, Nichols, testified that the boring logs did not misrepresent the on-site soils: "I think that the borings reflect accurately the type of soils that were encountered," Trial Tr. at 1942, and that, "in that type of an environment on Kodiak Island, it isn't terribly unusual to find water problems, subsurface water problems." Trial Tr. at 1937.[39] In a report prepared by Alaska Testlab, Nichols stated: "The findings of the current investigation are technically consistent with the previous site studies by Kinney Associates and Shannon & Wilson. The soil types and stratigraphy described in this report are essentially identical to those described by others." Alaska Testlab Report, "Subsurface Water Investigation," May 23, 1989, at 10–11. In an earlier report to NCI, Nichols also wrote:

> The lack of detail on the site plan indicates that significant amounts of ground water and surface water were not necessarily anticipated by the designer. For a project of this size, given the climate and

Alaska Testlab Report, "Discussion of Surface and Subsurface Drainage," March 20, 1989, at 6 (emphasis added).

**38.** In a letter to the CG in June 1989, Fred Brown concluded that NCI should have known of the water seepage: "The impervious frost susceptible nature of the on-site soils is also no mystery to the contractor in that the logs and soil descriptions in the Kinney foundation report are identified as 'predominantly silts and are frost

susceptible.' " Shannon & Wilson Letter, June 30, 1989.

**39.** The court asked Nichols whether the phenomenon of increased saturation in that area between the surface and the ground water table is unusual. He responded that it is "real common, yes. That's not unique to Kodiak. I mean, . . . it happens here in Anchorage and lots of other locations." Trial Tr. at 1854.

topography in Kodiak, that lack of detail is surprising.

These items are all evidence that the volume of ground water and surface water encountered was not completely anticipated. *However, we emphasize that what we saw at the site during our visits in February, though not consistent with the documents, is consistent with our experience.* Alaska Testlab Report, "Discussion of Surface and Subsurface Drainage," March 20, 1989, at 7 (emphasis added). Mr. Davisson, NCI's other expert, admitted at trial that ash is not unusual on Kodiak, and that it is not an unusual phenomena to have water flow out of a cut in a hillside. Trial Tr. at 363. Davisson also seemed to admit, under cross examination, that a contractor might understand this phenomena. *See id.* at 365 (Davisson).

In sum, the court concludes that NCI has failed to establish an affirmative representation by the Government that there would not be subsurface water flow into the site. Nor has it established that the actual conditions differed materially from information represented by the contract documents. It follows that NCI cannot establish that its excess costs stemmed solely from a materially different subsurface condition.

### b. Type II Differing Site Condition

■ At trial NCI asserted that the subsurface interflow was so unusual that it constituted a type II differing site condition. A type II differing site condition consists of a combination of two of the following three elements:

(i) the physical condition at the site was unknown; or (ii) said condition was unusual and could not be reasonably anticipated by the contractor from his study of the contract documents, his inspection of the site, and his general experience, if any in the contract area; and (iii) the condition encountered was materially different from those ordinarily encountered and generally recognized as inhering in the work of this character.

*Youngdale,* 27 Fed.Cl. at 527–28 (quoting *Servidone Constr. Corp. v. United States,* 19 Cl.Ct. 346, 360 (1990) ("*Servidone I* "), *aff'd,*

931 F.2d 860 (Fed.Cir.1991)) (other citations omitted); *see also Lathan Co. v. United States,* 20 Cl.Ct. 122, 128 (1990).

■ In determining whether a particular condition is "unusual," the encountered condition is judged against the "normal conditions for the area." *Servidone I,* 19 Cl.Ct. at 367 (citations omitted). *See Charles T. Parker Constr. Co. v. United States,* 193 Ct.Cl. 320, 334, 433 F.2d 771, 778 (1970) ("agency decision found that hard, abrasive rock was generally recognized and usual in this geographic area"). An unforeseeable condition is often described as one which the contractor could not have reasonably anticipated from an inspection of the contract documents, the contractor's site inspection, or the contractor's general experience. *Youngdale,* 27 Fed.Cl. at 537–38; *Servidone I,* 19 Cl.Ct. at 371 (citing *P.J. Maffei Bldg. Wrecking Corp.,* 732 F.2d at 917) (other citations omitted); CIBINIC & NASH, at 513 (citations omitted).

It is settled that "a contractor who knows or should have known the facts of the conditions at the site is estopped to claim a changed condition." *Vann v. United States,* 190 Ct.Cl. 546, 571, 420 F.2d 968, 982 (1970); *see Youngdale,* 27 Fed.Cl. at 538 (quoting *Vann* ). In this case, as stated earlier, the Kinney Report, in conjunction with the boring logs, put the bidders on notice of the possibility of water seepage from the soft permeable ash and peat layers. This information is imputed to NCI. A contractor's general knowledge and experience will effect whether or not a condition is "unknown." *See Spirit Leveling Contractors v. United States,* 19 Cl.Ct. 84, 95–6 (1989) (concluding contractor had knowledge of excessive rainfall and flooding because it was forewarned of these conditions and had previous crisis experience); *see also Appeal of Cannon Structures, Inc.,* AGBCA 90–207–1, 93–3 BCA ¶ 26,059, at 129,537, 1993 WL 177682 (May 26, 1993) (no evidence that seeps were not discoverable on the basis of the contractor's site visit or its general knowledge); *Appeal of Fairbanks Builders, Inc.,* ASBCA 18288, 74–2 BCA ¶ 10,971, at 52,218–19, 1974 WL 1613 (November 21, 1974) (presence of permafrost was not considered unknown con-

dition where contractor had work experience in Alaska). In the case at bar, NCI had substantial experience and knowledge regarding Kodiak Island. It had done work on Kodiak Island for many years prior to bidding on the Lake Louise project, and several of its projects had been quite substantial, including the construction of the largest health care facility on the island.

The Government's expert, Fred Brown, stated that it is not unusual for water to flow from a cut in a hillside on Kodiak Island given the soils that predominate. In a report to the CG, Fred Brown also states:

> [W]e believe that a locally experienced, fully knowledgeable contractor (both Neal & Felton) would be knowledgeable of the behavior characteristics of these soils and what to expect with regards to unsuitable soils, sub-arctic weather conditions (rain, snowfall, and freezing temperatures), *hillside water seepage and runoff,* and the silty frost susceptible, moisture sensitive nature of the local soils.

Shannon & Wilson Report, "Differing Site Condition Analysis," February, 1995, at 5 (emphasis added). In addition, while a report prepared by NCI's expert, Mr. Nichols, stated that the geotechnical analyses were not done with this water problem in mind, Nichols wrote in a 1989 report to NCI, "we emphasize that what we saw at the site during our visits in February, though not consistent with the documents, is consistent with our experience." Alaska Testlab Report, "Discussion of Surface and Subsurface Drainage," March 20, 1989, at 7. Finally, as the court has already noted, plaintiff's expert, Mr. Davisson, a civil engineer specializing in geotechnical and structural engineering, admitted, on cross examination, that ash is not unusual on Kodiak, and that it is not an unusual phenomena to have water flow out of a cut in a hillside. The court finds that the water seepage on the site was not an unusual phenomenon on Kodiak Island, and certainly should have been foreseen by a contractor, such as NCI, with considerable building experience on the island.

Finally, NCI had to prove that the subsurface flow encountered differed materially from conditions normally occurring when performing similar work. Plaintiff has not offered any proof that the soil configuration and the water seep differed in any way, let alone differed *materially,* from the conditions normally encountered and generally recognized as inherent in the type of excavation work performed by NCI. As already mentioned, even NCI's experts support the conclusion that excavation into a hillside, even in areas other than Kodiak Island, may result in water seepage. *See* Trial Tr. at 363, 365 (Davisson); Alaska Testlab Report, "Discussion of Surface and Subsurface Drainage," March 20, 1989, at 6–7 ("Based on our visits to this site and our experience with other projects in Alaska with similar topography and climate, we are not surprised at the amount of water being encountered.").

The court concludes that plaintiff has not proved by a preponderance of the evidence that the encountered subsurface water seepage was a differing site condition. The court notes, moreover, that even if there was a showing of CG responsibility, NCI has failed to prove by a preponderance of evidence that it incurred frost-heave-caused specific delays. In its post trial briefing, the only support that NCI cites for this assertion is testimony by Mr. Neal and Mr. Lundgren. Pl.Post Trial Br. at 17. The testimony referenced is wholly inadequate for that purpose, however. *See* Trial Tr. at 605 (Neal stating that the CG's request to delay the installation of the dry-wall was a "further stoppage" of NCI's work), 1467 (Lundgren stating, "We were being held up because we couldn't frame on the buildings, we couldn't do a lot of work because of the frost heave."). Contrary to NCI's contentions, evidence was presented that by March of 1989 the frost heave problem was not causing additional delay. Nichols, an NCI expert, wrote to NCI stating: "Based on what we have seen at the site, and our conversations with Mr. Lundgren of Neal & Company, it is our opinion that you can proceed with enough units to not significantly delay or interrupt your schedule." Alaska Testlab Report, "Evaluation of Foundations," March 7, 1989, at 7.

### 5. *The CG's site drainage plan*

As has been explained previously, a large amount of water accumulated on the site.

Photographs taken during construction, the Alaska Test Lab Report, as well as the daily reports and trial testimony indicate that poor site drainage played a major role in allowing the accumulation of that water. The parties, however, reach differing conclusions as to who was responsible for the poor drainage.

■■■ NCI claims that the CG design it implemented contained significant site drainage flows, and that the plan was defective in several ways.[40] First, NCI asserts, the design did not provide for adequate surface grading to channel water away from the houses and construction. In particular, NCI claims that the design, which called for the hill to be cut back in order to make space for the northern row of houses, allowed a steep slope to remain directly behind certain units, leaving insufficient space to divert water from the foundations during construction. NCI also alleges that the CG caused undue delay to the project by not responding in a timely manner to NCI's design clarifications requests (DCR's), regarding proposed drainage solutions. The CG contends that the project could be constructed as designed without difficulty and that the excessive water and drainage problems encountered were the result of the poor construction practices

of NCI and its earthwork subcontractor, Felton Construction. It also contends that its responses to NCI's DCR's were timely.

Mel Nichols, of Alaska Testlab, testified that the plans were "very inadequate," and "[they show] a very, very poor examination of the control of surface water and the subsurface water at the whole site.... [They are] probably the ... worst set of drawings I've ever seen.... There's almost a complete lack of spot elevations." Trial Tr. at 1857–58. Nichols explained that the houses should have been sited to permit at least 10 to 15 feet of slope around the entire unit, and that there was just not enough room behind many of the units to accomplish this.[41] In one instance, there was only 3 feet between a unit and a 5 foot embankment. He stated, "[I believe the drainage plan] doesn't work, [and] it had to contribute significantly to problems that the contractor had on-site." *Id.* at 1865–66.[42] Nichols pointed out that the Corps' landscape architect criticized the design phase [43] for not providing a contractor with enough detail.

Regarding grade "busts," [44] Nichols testified that, "[several of] the grades were about eight feet off. In other words, if they had actually graded the site to the design con-

---

**40.** For any of its defective specification claims, NCI may recover "any costs incurred due to delay incurred by reason of [a] mistake in the specifications," so long as the allegation is proven. *Westerhold v. United States,* 28 Fed.Cl. 172, 174 (1993). *See Beauchamp Constr. Co. v. United States,* 14 Cl.Ct. 430, 438 (1988) ("all delay produced by defective specifications is per se unreasonable and compensable") (citing *Chaney and James Constr. Co. v. United States,* 190 Ct.Cl. 699, 707, 421 F.2d 728 (1970)).

**41.** *See* Alaska Testlab Report, "Discussion of Surface and Subsurface Drainage," March 20, 1989, at 9 ("We recommend maintaining a grade of 3% to 5% for a distance of at least 10 to 15 feet around the entire perimeter of the building, and modifying the grading behind units 6 through 17 to accommodate such measures.").

**42.** *See also* Alaska Testlab Report, "Discussion of Surface and Subsurface Drainage," March 20, 1989, at 7–8 (stating, "[d]rainage behind Units 6 through 17 has not been established clearly by the Site Grading and Drainage Plan. This is a serious problem that must be corrected.... The site plan does not provide much detail about how water is to be directed away from the buildings.

Under General Notes, Note # 4 states 'Grade to provide site drainage away from all units.' We agree with that. However, the detail on how to accomplish that is sorely lacking, and the design contours shown behind most of the units are not consistent with that directive."); Alaska Testlab Report, "Analysis of Foundations," March 7, 1989, at 7 (stating, "There are substantial drainage problems, both surface and subsurface, at the site that have not been adequately addressed by the site plan, and in some cases have been incorrectly addressed by the site plan.").

**43.** Colleen Thorpe, the landscape architect for the project made several suggestions to the CG regarding drainage early in the planning stages of the project. These were specifically stated on construction drawings. She expressed concern that the information provided on the civil drawing was "not adequate" for construction of the project site with respect to overexcavation and water drainage around the buildings. Her suggestions were not incorporated into the final plans.

**44.** A grade bust is a difference between the contouring design elevations and the intended elevations of the houses themselves.

tours that were shown on the drawing, it would have been ... about six to eight feet above the windowsill." *Id.* at 1860 (Nichols). Tony Neal, Richard Lundgren, NCI's on-site superintendent for most of the project, and M.T. Davisson, of NCI's civil engineering experts all supported Nichols' conclusion. Mr. Neal testified that the were numerous grade errors and that in one particular area on the northern row of houses there was virtually a cliff directly behind the house. Davisson also stated that there was a large dropoff from the hill "very close" to several units: "There was no way that the Government's drainage design was ever going to handle what was happening there. That led to some of these 20 changes in grade that I mentioned took place during the course of the project, and that still didn't get it done." *Id. See also id.* at 1181–84 (Lundgren discussing cliff behind several units), 1195–96 (grade bust between slab and finished grade on unit one), 1196–97 (grade bust regarding driveway of unit one). Lundgren referred to several instances of grade busts particularly behind lots 13 through 15, where the plans resulted in a five foot embankment directly behind a house. *Id.* at 1181–84. Numerous contemporaneous documents support NCI's position. COR Daily Prog. Report, January 13, 1989 (stating, "contour lines in error" behind unit 9); Memorandum from John Zabittenoff of Felton Constr., March 3, 1989 (stating there were grade errors around "2F" units which ranged from 4 feet low to 4 feet high, and that there were slopes between houses which were too step to control drainage); NCI letter to FD & CC, March 1, 1989 (stating several grade and drainage errors, such as the fact that around units 13 and 14 the grades were approximately 3′ above the finish floor elevation immediately north of the foundation wall, and rise an additional 9′, and that "the final grades on the north and east side of Lot[s] 9 and 20 as designed will flow directly into the house perimeter."); FD

& CC letter, April 26, 1989 (indicating that there was an error in contour lines around unit 9, and requesting cost proposal associated with moving hill further away from the unit); CG letter, March 20, 1989 (acknowledging that two foot contours around units 14 and 40, were not correct and stating CG was awaiting cost estimate from NCI").

Lundgren testified that while NCI had informed the CG of the large grade busts behind units 12, 13, 14, 19 and 20 in early 1989, the CG initially refused to approve an NCI request to regrade the area. The CG response in February, was that it "preferred" not to regrade unless safety problems existed. Then, almost eight months later, in August of 1989, the CG provided a separate response to the same request, issuing Modification No. 7, requiring additional excavation behind those units.

NCI also claims that the plans failed to utilize adequate drainage methods, such as subdrains for several of the individual units, and subsurface drains between the hillside and the northern row of houses. NCI contends that these design failures allowed water to pool around its work areas contributing to the frost heave problem. The CG design called for no drains to be installed on 11 units. The system used for 19 of the 30 units provided for the subdrains to empty the water into the utility trenches containing "free-draining soil." These trenches would then carry water partially down the slope and then into the natural soils. Even Fred Brown, the Government's own expert, who believed that the system worked, supported NCI's assertion that this was not a traditional or conservative method.[45] Brown stated that using a solid pipe to carry water from the subdrains to the storm drainage system in the streets would have been a "more positive" approach.

Nichols concluded that three additional corrections to the project would have aided

---

**45.** A Shannon & Wilson letter to the CG stated: We also understand that some below grade units do not have subdrains, but that downslope drainage is maintained via pervious materials below the floor slabs connected hydraulically to pervious materials in the utility trenches. While this latter subdrainage detail is not conventional nor conservative, as im-

plied in the ATL report, it can be considered as a suitable way to control the minor downslope drainage or seepage noted in the test pits.... A pipe in these trenches is obviously a more positive way of assuring that drainage is maintained downslope.
Fred Brown letter to CG, June 30, 1989.

in proper drainage. First, the houses should have been sited at a higher elevation, on top of non-frost susceptible soil. Second, the hill should have been cut back further behind the northern units in order to provide ground contours to draw the water away from the houses. Third, there should have been a drainage trench, as there had been previously, running along the toe of the cut in the hillside to carry runoff away from the houses.[46] Apparently Nichols' second and third suggestions were brought to the CG's attention at some time during construction, and they were not accepted. Lundgren stated that NCI had suggested cutting the hill further back and using a pipe to divert water away from the project and that idea was rejected by the CG. Greenamyer admitted that the construction of a drainage ditch had been suggested and that the CG had denied that suggestion. His report specifically states that pipes should have been used in conjunction with the footing or subdrains to ensure adequate drainage beneath the units. NCI avers that this poor design failed during the colder months because the soils froze and became less "free-draining."

The Government did little at trial to defend its original drainage and landscape plan. The court finds that the grade busts, the lack of any subdrain system on 11 units, and the ineffective subdrain design on the remaining units, contributed to the accumulation of water on the site.

Another flaw in the project's design, contends NCI, was the failure to replace an existing drainage ditch which ran along the north side of the site just below the slope of the hill.[47] This ditch originally provided drainage along the toe of the hillside, in both directions, to deflect water from the previously existing units. Pursuant to the CG plan, the original drainage ditch was eliminated by grading and filling, and several of the houses were aligned along the former location of the ditch. Nothing in the grading plan called for a replacement for the previous ditch.[48]

 After the contract was complete, the CG had plans prepared on two separate occasions to add subsurface drainage on the site.[49] The first proposal, made in early 1991, called for the placement of trenches,

**46.** Nichols speculated that this could have been accomplished by placing a perforated pipe in the bottom of the trench and covering it with "sewer rock" which ranges in size between an inch and a half to three inches in diameter and is very permeable. He believed that this could be done with a trench approximately six feet deep and three feet across.

**47.** This is consistent with an Alaska Testlab report, which states:

The demolition plan showing the conditions of the site prior to removal of the old housing and ancillary facilities shows a well-defined ditch at the base of the ridge along the north of the site. The new site plan shows this ditch being filled, excavation into the ridge, and houses near the base of the ridge, though it does not show reestablishing that ditch. In our opinion, this is a mistake that should be corrected. Alaska Testlab Report, "Discussion of Surface and Subsurface Drainage," March 20, 1989, at 7–8.

**48.** Sideview contour drawings of some of the units indicate a very slight dip behind the structures. If this was intended to be a drainage plan, it was insufficiently highlighted and, in any event, there was not enough room behind the middle units on the north side to put in a meaningful drainage ditch.

**49.** Prior to the commencement of trial, the court ruled, over the Government's objection, that this evidence was admissible. The Government contended that the evidence was remedial in nature and thus precluded by Rule 407 of the Federal Rules of Evidence. The court concluded that this evidence was not squarely within Rule 407. First, the primary purpose of the rule prohibiting evidence of remedial measures is twofold—to prevent prejudice to the defendant where jurors would equate subsequent design modifications to an admission of a defective design; and to further the social policy of encouraging manufacturers to create safer products. *Raymond v. Raymond Corp.*, 938 F.2d 1518, 1522–23 (1st Cir. 1991). *See Bauman v. Volkswagenwerk Aktiengesellschaft*, 621 F.2d 230, 233 (6th Cir.1980). The case at bar is not a negligence action involving a consumer product or service, nor is it before a jury. Thus, the court found that the purpose of Rule 407 would not be served by the exclusion of this evidence. *See Appeal of McNally Indus., Inc.*, ASBCA 43027, 93–3 BCA ¶ 26,130, 1993 WL 190382 (May 20, 1993). In any event, evidence of remedial measures does not run afoul of Rule 407 when it is used to prove the feasibility of a particular measure. *Southland Enters., Inc. v. United States*, 24 Cl.Ct. 596, 603 (1991). The evidence is thus admissible to prove that the design improvements could have been incorporated into the plans with a beneficial effect.

with perforated pipe at the bottom, around unit 3, and units 7 through 13. Apparently this plan was never implemented. The second proposal, made in late 1992, was actually utilized. This addition provided a "French drain" system behind units 7, 8 and 9. Fred Brown testified that the improvements behind units seven, eight and nine were merely "cosmetic," although he admitted that this addition would help control the ponding of water behind those particular units. NCI contends that this feature should have been included in the CG's original design for its project and that, if it had been, the construction of the project would have been substantially easier.

Fred Brown testified that NCI only had to provide a small ditch behind those units during construction in order to control runoff, and that once the project was completed, the design grading plan could control the water runoff. Trial Tr. at 2760–61 (Brown stating, "if [NCI] had cut a two and a half or three foot deep trench across the top, and [NCI] could have done that selectively, [NCI] should have been able to intercept most of the water … from up above, including any interflow.").[50] However, Brown also stated that in order for this ditch to work during construction, it would have been necessary to place it on the hillside, beyond the trees off the site. *Id.* at 2761–62. In other words, it would have required CG approval. Similar approval was initially denied in connection with pushing back the bank.

Ted Trueblood, a civil engineer with approximately 25 years of experience and President of Tryck, Nyman, Hayes, a construction consulting firm in Alaska, testified on behalf of the CG on the issues surrounding the construction and site grading plans. He stated that the construction and demolition drawings, as well as the design plans and specifications, were adequate for the project. He stated that the section drawings which accompanied the main drawing, C1, indicated the existing ground and the intended grading for the buildings, and that they were adequate for a contractor to build the project.

■■■ A basic tenant of government contract law is that the Government warrants the performability of the design specifications it promulgates. *United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918); *Blount Bros. Corp. v. United States,* 872 F.2d 1003, 1007 (Fed.Cir. 1989); *Hol–Gar Mfg. Corp. v. United States,* 175 Ct.Cl. 518, 360 F.2d 634, 638 (1966).[51] Generally, "design specifications created by the government contain an implied warranty that if the contractor adheres to the specifications, the result will be acceptable to the government." *Ehlers–Noll, GmbH v. United States,* 34 Fed.Cl. 494, 499 (1995) (quoting, *T.L. Roof & Assoc. Constr. Co. v. United States,* 28 Fed.Cl. 572, 578 (1993)). Although the Government warrants the accuracy of the specifications, they need not be completely accurate. They must be reasonably accurate for the task. *John McShain, Inc. v. United States,* 188 Ct.Cl. 830, 833, 412 F.2d 1281, 1283 (1969) (stating "[a]lthough Government-furnished plans need not be perfect, they must be adequate for the task or 'reasonably accurate.'"). If defects within the Government's specifications result in increased costs to the contractor, however, the Government is liable. *Westerhold v. United States,* 28 Fed.Cl. 172, 174 (1993) (citing *Spearin,* 248 U.S. 132, 39 S.Ct. 59).

■■■ The court concludes that there were significant grade and design errors contained within the contract plans and specifications. The written comments by Colleen Thorpe, the design architect, warned that the final design grades called for the hillside to be too close to the finished housing units. This is borne out by photographs taken during con-

---

50. *See also* Shannon & Wilson report, "Differing Site Condition Analysis," February, 1995, at 20 (stating: "Our analysis of the volume of water that can accumulate on site based on Kodiak rainfall/snowfall conditions … indicates that [it] is not that large [and] that it can be handled by digging small channels to carry ponding water temporarily through the site at each unit or by installing temporary upslope cut off trenches.").

51. In *Spearin,* the Court stated, "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." 248 U.S. at 136, 39 S.Ct. at 61.

struction. In several locations there was simply no room for the contractor to maneuver. It is clear that the poor drainage design made it virtually impossible for the contractor to control surface water flowing off the slope in the vicinity of units 13 through 15.

The fact that the CG implemented an additional underground drainage system behind the northern row of houses is also evidence that the original design was inadequate. *See Appeal of McNally Indus., Inc.,* ASBCA 43027, 93–3 BCA ¶ 26,130 (Government's issuance of changes to "correct design errors" was held to prove original specifications were defective). While the contractor has the burden of proving that the detailed requirements of the specifications are defective, "the actions of the Government during performance of the contract may demonstrate such defects." CIBINIC & NASH, at 281. *See Big Chief Drilling Co. v. United States,* 26 Cl.Ct. 1276, 1295 (1992) (finding defective drilling specification where the Government refused to permit relaxation of drilling requirements on first well, but granted a blanket deviation on subsequent wells); *Appeal of McNally Indus.,* ASBCA 43027, 93–3 BCA ¶ 26,130 (Government's issuance of changes to "correct design errors" was held to prove original specifications were defective).

The court also finds that NCI is not responsible for its failure to construct a temporary drainage ditch. The court is persuaded that there was not room behind units 13 through 15 to place a drainage ditch without a modification to the site grading plan. As Brown testified, for such a drainage ditch to have been effective during construction it would have been necessary to place it outside the project area. This would have required CG approval, which was refused. The only modification that was granted in this area came very late during the construction process.

Two other assertions of improper design the court rejects. NCI makes the assertion that the CG design for the footings contributed to the frost heave. This allegation fails for lack of proof. The design followed Kinney's recommendations to place perimeter footings three feet below grade, and place 30 inches of [non-frost susceptible soil] subbase

under the streets. As Nichols wrote in a January 25, 1989 letter concerning "Frost Heave Problems": "The 30 inches of bury for footings recommended in the Kinney soils report and detailed on the drawings is probably adequate to protect footings at the site, even in an unheated state. However there are several footings exposed to the weather that are not currently backfilled...."

The design deficiencies regarding the insulated garage slabs, which Nichols discussed, are a moot point during construction. The flaw, as Nichols discussed, is not allowing waste heat from the dwelling to enter the unit. This assumes completed construction, but the frost heave NCI encountered on the main slabs were prior to the installation of heat and completion of the units. Even Nichols recognized that remedying this problem would have had no effect on the difficulties during construction: "In general, the rest of the foundations, the design looked fine." Trial Tr. at 1907.

In sum, the CG thus bears at least partial responsibility for whatever the additional time and expense NCI incurred in coping with an inadequate design.

### 6. Compaction testing

NCI also contends that its work was impacted by overzealous testing imposed by the CG. The contract required backfill surrounding the concrete footings and slabs to be compacted to a specific density. These specifications required retesting if the contractor did not achieve the specific compaction level. Contract § 01401, ¶ 3.3.5.8; § 02203, ¶ 3.5, 3.7. The contractor had to achieve 95 percent compaction of soil underneath the footings, as well as the soil placed around footings. Contract § 02203, ¶ 3.3, 3.7. While 95 percent compaction is not necessarily difficult to achieve with dry soils, when the soil is wet, it is extremely difficult to obtain. NCI contends that, in violation of the contract specifications, the COR required too many compaction tests, and retests, causing undue delay to backfill work and exacerbating the frost heave.

The court finds that the CG's demands for repeated compaction tests were neither un-

reasonable nor contrary to the contract. *See* Contract § 02203, ¶ 3.10 (requires one test per 20,000 sq ft.). *See also* § 02203, ¶ 3.3 (95 percent compaction requirement for overexcavation refill); § 02203, ¶ 3.7.1—3.7.5 (95 percent compaction requirement for bedding, road backfill, utility trenches, and backfilling for pavement and slabs) (contract documents). The contract makes specific reference to tests that fail: "The Contractor shall repeat tests and inspections after each correction made to nonconforming materials and workmanship until test and inspections indicate the materials, equipment and workmanship conform to the contract requirements. The retesting and reinspections shall be performed at no additional cost to the Government." Contract § 01401, ¶ 3.3.5.8. *See* 48 C.F.R. § 42.246–12(h) (1995) (if work is found to be defective or nonconforming due to the fault of the contractor or subcontractor, the contractor is to bear the expense of the examination and satisfactory reconstruction). The court also notes that Rounds himself stated that the average compaction test failure percentage for the project was 20 percent. There was no clear evidence that that failure rate was extraordinary or that it was indicative of conditions that were unusual or unforeseen. Finally, the court is persuaded, as explained below, that NCI could have protected the footings and slabs by placing the backfill without the required compaction and then compacting at a later time, or, if necessary, replacing the soil in the spring.

### 7. Other alleged defective specifications

NCI contends that throughout the project, NCI and its subcontractors encountered numerous errors in the design detail of the construction drawings and specifications. These items included: specifications calling for a bathroom towel bar to be placed over the light switch; the kitchen cabinet design requiring cabinets too wide for the particular location; the lack of smoke detectors;[52] several piping and drain design problems;[53] improper weather stripping on the patio double doors; and an improper boiler system.

While there appear to have been numerous small design problems, NCI presented evidence regarding these items in a piecemeal fashion. Examples were presented, but NCI made no real effort to link them, individually or collectively, to particular costs, delay or impact.[54] Two allegations were the subject of extensive testimony however, and will be separately addressed: the improper door weather stripping, and the problems associated with the boiler system.

#### a. Weather stripping

█ According to NCI, after a CG modification requiring the use of vinyl "sweeps" as weather stripping to seal the gap below the exterior patio double doors, the doors leaked and permitted wind-driven rain to enter the units. According to Reed Kent, NCI's project manager during the completion of the project, after the CG modification, the "astragals", weatherstripping which created the seal between the two doors, did not go far enough to the ground to cover the gap between the stationary door and the sweep at the bottom of the movable door.

The type of weatherstripping called for is a good sealant on a single door, but not for the double doors used for the patios. If the Government had been willing to modify the specifications, NCI could have ordered full length astragals from the manufacturer to address this problem. However, the CG failed to make such a request, while continuing to demand that NCI fix the existing problem without providing it with the ability to do so.

As this unnecessary dispute continued, the poor weather seal on the doors permitted excessive moisture to enter the units. In some units, this slowed down interior finish

---

52. *See* Modification No. 4 (CG unilaterally required NCI to install 84 smoke detectors).

53. *See* Modification No. 16 (adding $9,319.91 to contract to pay for cost of DCR's 008, 016, 021, and 022).

54. The Government offered the conclusion of Adkins, its scheduling expert, that 45 working days, or 63 calendar days, of delay is traceable to items for which the CG is responsible, including such smaller design defects. The court will treat Adkins' calculation as an admission on behalf of the CG.

work such as dry-wall, wood trim work, and caulking joints, all of which are sensitive to elevated moisture levels. The court also finds that CG's practice of continuously placing the weatherstripping problem on the discrepancy lists hampered NCI's completion of the lists before the CG ordered it off the site. Virtually every punch-list contained directions to repair these "sweeps".

### b. Hot water boilers

During the cold construction months, NCI had trouble maintaining minimum temperatures necessary to perform the interior work, such as installation of the dry-wall, dry-wall taping, painting, finish carpentry, installation of cabinetry and flooring, and plumbing trim. It contends that this further delayed the progress of NCI's subcontractors through the project. It is apparent that the poor heating was the result of undersized individual boilers for each unit and the use of incorrect fuel oil in several units.

Regarding the boiler size, Coffman Engineers, retained by the plaintiff, determined that the CG's choice of boilers was flawed for several reasons. First, the CG assumed that the outside temperature would not drop below thirteen degrees Fahrenheit for 97.5% of the time and that lower indoor temperatures would be acceptable for the remaining periods of time. Their April 27, 1990 report states that, while this assumption is correct under the ASHRAE Fundamental Guide book, the design did not take into account the fact that on the colder days, it is much colder than thirteen degrees.[55] Moreover, it concludes, "the calculated heating load did not take into account the heat loss through the heating pipe located in unheated spaces or uninsulated pipe which could be as great as 10% of the total heating load." Nor did the design take into account the high wind velocity that often accompanies the lower temperatures. The court finds that the boilers were, in fact, undersized, and that this hampered NCI's construction.[56]

In addition to their small size, the use of incorrect fuel oil, which caused the boilers to continuously "burn out" and require restarting, also hampered NCI's work progression. While it is clear that there were "burn outs" due to improper heating fuel, the parties disagree as to who supplied that fuel. The Coffman report concluded that the fuel oil supplied was not of the correct type and caused "improper combustion, sooting of the chimney, and burner misfiring." It is NCI's contention that the improper fuel was supplied by the CG, and thus any resulting interference of work should fall upon the CG.

Ed Greenamyer testified that the CG did not supply fuel for the units until the permanent tanks were installed below the surface and the units were complete. NCI was responsible for the fuel while the boilers were connected to temporary above ground tanks, which also supplied fuel for temporary heaters.

There was no secondary evidence to corroborate Neal's testimony that it was CG-supplied fuel that caused the problem. Without better documentary evidence, the court

---

55. For example, on January 28, 1989 the recorded low was negative sixteen degrees and recorded high was only negative four degrees, with a wind speed of 48 knots.

56. The only contrary evidence provided by the CG was an attempt to show that the engineer's report was biased. In a memorandum to NCI's superintendent, Tony Neal stated:

You are going to contract with Coffman Engineers to get an expert opinion from a mechanical engineer [regarding the boilers].... I want the report to name every possible bad thing against the Coast Guard design that we can. I do not want to hear about any bad stuff we did but if we did I think we ought to know about it.

. . . .

I sent you a fax regarding Dick Newkirk of Proctor.... You will contact Dick as he is the manufacturer's representative on the Boilers and get him down there and get his manufacturer's recommendations, all of which, I want to be negative to the Coast Guard.

In this regard, if there is any way you can discover that the way the boilers are acting poses a safety problem either to the facility or to persons, I really want to attack safety. If there is any way possible that it can be a safety problem to workman, that would be lovely. NCI "Action Request," January 6, 1990. While this letter does call into question the objectivity of the engineer's report, standing alone it is insufficient to completely discredit its conclusions.

finds that NCI has not met its burden of proof on the fuel issue.

### 8. Alleged violation of the duty of good faith

A major theme of NCI during trial was that the CG dealt with it in bad faith and had what Mr. Neal referred to as a "hidden agenda" throughout the project. NCI contends that this bad faith was manifested by such conduct as CG's failure to respond in a timely manner to issues that arose during construction, not granting time extensions for changes and other extra work, the CG's insistence on the compaction retests, and extensive and unreasonable "punch-lists."

Concerning the duty of good faith and fair dealing, this court has stated:

> Every contract, including those in which the Government is a party, contains an implied covenant of good faith and fair dealing. *Hughes Communications Galaxy, Inc. v. United States*, 26 Cl.Ct. 123, 140 (1992); *Solar Turbines, Inc. v. United States*, 23 Cl.Ct. 142, 156 (1991). When one party has the authority to exercise discretion to determine an essential term of a contract, as here, the covenant of good faith and fair dealing requires that the exercise of that discretion be reasonable.

*Orange Cove Irrigation Dist. v. United States*, 28 Fed.Cl. 790, 800 (1993) (other citations omitted); *see* U.C.C. § 1–203; RE-STATEMENT (SECOND) OF CONTRACTS § 205. In addition, "[t]he Government has an implied obligation to refrain from willfully or negligently interfering with a contractor's performance." *SMS Data Prods. Group, Inc. v. United States*, 17 Cl.Ct. 1, 6 (1989) (citing *Malone v. United States*, 849 F.2d 1441, 1445 (Fed.Cir.1988)) (other citations omitted)). The duty is stated in two parts: "(1) a duty not to act in a way that will hinder performance, and (2) a duty to cooperate by taking affirmative action." CIBINIC & NASH, at 296. A breach, by the Government, of either its duty to exercise its discretion reasonably, or its duty not to hinder performance will result in liability.

It is true that the CG's actions, in some instances, were inappropriate and unprofessional. If the CG had taken a more flexible approach, there most likely would have been less delay and fewer cost increases, as well as a reduction in the overall friction between the parties. However, the court believes that the conduct of CG employees never rose to the level of bad faith and that its actions were not the product of a "hidden agenda" designed to force NCI to shoulder the costs that were actually the fault of the CG.

NCI also claims that the Government failed to issue timely orders. If such conduct is egregious enough, it can constitute a breach of the duty to cooperate. *See Hoel–Steffen Constr. Co. v. United States*, 231 Ct. Cl. 128, 138–39, 684 F.2d 843, 849–50 (1982) (unreasonable denials of approvals or delays in giving approvals called for by the contract are breaches of the duty of cooperation); *Appeal of Raytheon Serv. Co.*, GSBCA 5695, 81–1 BCA ¶ 15,002, 1981 WL 7359 (March 19, 1981); CIBINIC & NASH, at 305–07; *see also Malone v. United States*, 849 F.2d 1441, 1445–46 (Fed.Cir.1988) (finding CG's failure to specifically reject work coupled with CO's misleading representations resulted in a material breach of contract for interference in plaintiff's performance).

NCI points to a pre-construction meeting at which the CG stated that design clarification requests ("DCR's") would be addressed quickly. Minutes of that June 28, 1988, meeting state: "Contractor asked how quickly DCR's will be processed. LT. Legier responded that turn-around time depends on complexity of DCR but can typically be expected within 10 days, and that quicker processing may be possible if the contractor indicates a particular DCR is time-critical." Contrary to this assurance, the CG's responses were often untimely. For example, according to Mr. Lundgren, the CG ultimately took more than eight months to respond to NCI's request to regrade the areas behind units 12, 13, 14, 19 and 20. In addition, Lundgren testified that NCI waited for over 275 days for a response from the CG regarding an inconsistency in the drawings for a specified retaining wall. Lundgren also stated that numerous other DCR's went unanswered for a lengthy period of time. The

number of DCR response times over 15 days was 142 out of a total of 219 requests. DCR No. 106, submitted by Big G for relocation of electrical outlets on March 14, 1989, was not answered until December 6, 1989, and DCR No. 137 submitted by NCI regarding stair stringers on June 29, 1989 was not answered until December 6, 1989.

It is apparent that the CG's performance with respect to making timely responses was poor.[57] The court declines, however, to find that the CG response time was so consistently unreasonable or misleading, or motivated by ill-will, to have constituted bad faith or breach of a duty to cooperate. Unlike plaintiff, the court does not view in these facts plausible evidence of a hidden agenda to thwart NCI's performance.

The question of compaction tests has been discussed separately. There is insufficient evidence that the CG did anything beyond what was permitted by the contract in that connection.

### 9. Overinspection

NCI also claims that the CG's animus towards it was reflected at the end of the project in totally unreasonable "punch-lists." Neal testified that they contained items which were not in need of repair, or which could not be repaired, or were not NCI's responsibility. By May, 1990 NCI had substantially completed the project and yet continued to work on lists with over 6,000 items, until the CG required NCI to leave the site on August 20, 1990. Robert Mallahan, the project manager for the CG, stated that he would have expected the discrepancy list, or punch-list, to have consisted of approximately 30 pages—one page per unit. He also stated that it should not have been more than could be handled by a few people within ten working days. Thomas Scarsborough, a civil engineer hired by Seaboard to investigate the project in 1990, testified for plaintiff, stating, "it just appeared to me that ... any type of scratch someplace would show up on this list.... And the ... items were poorly defined. The workman would have difficulty

determining what was listed, without Mr. Greenamyer standing there alongside of them pointing out what was to be done." Trial Tr. at 4325–26. Scarborough also stated that when he arrived at the site on September 28, 1990, approximately one month after NCI left the project, that it "looked complete," and that he was "somewhat amazed" because of the volume of punch-list work which the CG claimed was not completed lead him to believe that the project was much less complete.

██ Reed Kent, NCI's last superintendent on the project, and someone the court found fully credible, arrived in March, 1990, and started working with punch-lists and CG rapidrafts almost immediately. Kent stated that the lists were very picky, and often contained items that could not be fixed. For example, Kent stated that the door sweeps on the patio doors were included on almost every discrepancy list, but that there was nothing to fix, short of redesigning the types of doors and weather stripping. Neal testified that the exhaustive punch-lists delayed NCI's completion, partially because Greenamyer would constantly interrupt work to give NCI additional items and require them to be addressed quickly. In addition, Reed Kent stated that Greenamyer had told NCI workers what to do while he was doing CG rapidrafts (punch-lists) and this disrupted other work and slowed NCI's progress. The court is persuaded that NCI's presence on the job was continued unduly by over-zealous inspection and a resulting nit-picking punch list.

### B. Plaintiff's contributions to disruption and delay

The Government contends that, even if it is responsible for some of the delay and disruption encountered, the contractor has significantly understated its own contribution. There are two areas on which the Government focuses: contractor responsibility for the drainage problems it encountered, and disruption caused by the default or poor performance of subcontractors and suppliers.

---

57. It is not at all clear that there is a direct connection between delay in answering inquiries and plaintiff's overrun. Adkins testified persuasively to the contrary. For example, delays continued in completing the rough-in on building 18 through 21 after all inquiries had been answered.

### 1. Plaintiff's contributions to the drainage problems

 The court has rejected plaintiff's contention that the percolation of subsurface water into the site is a compensable differing site condition. The court has also held, however, that an inadequate CG drainage design contributed to NCI's water problems. The CG contends, nevertheless, that the primary reason water disrupted the contractor's work is that it stayed on site longer than it needed to for reasons completely within the contractor's control: Felton's inadequate site grading, NCI's failure to backfill the footings and slabs in a timely manner, and Felton's failure to cure a leaking water main.

The court finds that, while a poor contouring design may have made coping with surface flow difficult, NCI's own poor grading practices also substantially contributed to keeping the water on site. The evidence is overwhelming that Felton allowed water to accumulate and remain on the site by failing to adequately grade the site, by stockpiling dirt improperly, and by failing to protect open excavations.

Willy Krause, NCI's first on-site superintendent, testified that by mid-November of 1988 Felton was already behind on rough-grading the site:

> My concerns were that the winter was going to set in, and knowing the time in Kodiak and other areas in Alaska, that with this shape of terrain, it would be disastrous.... [T]here [was] no contouring of the ground, there [was] no channeling of anything. There [was] no water run off. Obviously, with the heavy rainfall ... it just turned into a disaster.

Trial Tr. at 1264. A letter sent to NCI early in 1989, by Shannon & Wilson, reflected that:

> In many cases, the site ground surface has not been contoured to encourage draining of surface water away from the perimeter of some of the units causing water to pond and freeze close to the foundations. This water could be serving as a direct water

source to encourage the observed heaving noted to date.

Several other documents indicate that Felton did not properly grade the site. In a September, 1988 letter to Felton, NCI stated, "Your manpower loading on this project is inconsistent and inadequate to keep up with projected progress...." An NCI conversation record indicates that Felton's work was falling behind by the end of that month. A series of letters and memoranda reflect that, throughout the winter of 1988 and 1989 and into the spring of 1989, Felton was apparently still behind on its site work, and that Felton's poor work continued to delay the project into the summer of 1989. *See, e.g.,* Ward landscaping letter to NCI, July 22, 1989 (requesting extension of time to do landscaping, because condition of site work would not permit proper landscaping before winter[58]); CG letter to NCI, August 1, 1989 (stating "areas behind 20, 13—15 and 9 have not yet been graded to the finished grades.... Unit 20 in particular has a lot of dirt piled around it as spoil from your footing excavation operations."); Shannon & Wilson letter, "Frost Heave Conditions," January 23, 1989, at 4 (stating that the ground surface had not been contoured in several locations causing water to pond and freeze close to foundations, and that this water "could be serving as a direct water source to encourage the observed heaving noted to date."): CG Rapidraft letters, February 21, 1989 and February 10, 1989 (Greenamyer stating that footing excavations were retaining water from rain and melting snow, that water was ponded around concrete footings of numerous units, and referring NCI to dewatering provisions of contract).

The CG has also established that Felton unnecessarily stored soil on the site. Willy Krause, Richard Lundgren, and Ed Greenamyer all testified that Felton had left numerous piles of soil and other material around the site, and that NCI personnel had requested that Felton move these piles on several occasions. This is also supported by the Alaska Testlab report of March 20, 1989,

---

**58.** In three follow-up letters by NCI to Ward Landscaping, NCI assumed responsibility for late landscaping.

stating that, "there is mounded dirt around ... units [20 through 22] that has not been backfilled...." In addition, it took Felton several weeks to repair a water main which it inadvertently had cracked. *See* NCI letter to Felton, November 18, 1988 (stating Felton still needed to fix the leak in the main water main); NCI letter to Felton, November 28, 1988 (again notifying Felton that it needed to address water main problem "Although some sporadic digging has taken place to find a leak in the water main installed by your company, excavations have been left open with pipes exposed to freezing temperatures and the main energized. The apparent leak has not been found and water is leaking [into] a large portion of the project.").

In addition, NCI allowed several footings and foundations to remain unprotected from the cold weather longer than necessary. NCI failed to backfill the exposed footings and slabs in a timely manner, permitting the cold weather to freeze the soils below the footings and slabs, and allowing the infiltration of water into those soils. This delay was the result of a poor construction schedule, as well as simple negligence. NCI's footing concrete work was 186 calendar days ahead of its schedule. Twenty-nine of the thirty units were completed by January 9, 1989, which resulted in a number of the footings and slabs being laid during the winter months far ahead of the framing work. Footings and slabs were thus exposed to cold temperatures. Brown testified that:

> [R]ather than open up all the excavations at once and leave all the excavations exposed, had [NCI] planned [its] work a little bit better and ... slowed that down to where he put the tops on his buildings and enclosed them and backfilled them and put the drains in, I don't think a lot of the problems he would have, he would be seeing now. Or, he wouldn't have experi-

enced the water accumulating around the foundations and the resulting frost heave conditions.

Trial Tr. at 2879; *see* Trial Tr. at 2844 (Brown stating, "[i]f it had been constructed in sequence where [NCI] had put the foundations in, back filled, put the drains in, [the foundations] would have been less susceptible to [frost heave]").[59] Trueblood echoed this opinion, stating that NCI should not have excavated and poured concrete so far in advance of the rest of its construction work. *Id.* at 3104–05.[60] *See also* Alaska Testlab Report, "Evaluation of Foundations," March 7, 1989, at 6 (stating, "Portions of *all* the foundations have been constructed, [and] [n]one were heated...."); Shannon & Wilson letter, January 23, 1989, at 4 ("The buildings are in various stages of completion, ranging from completed foundations with no backfill or other protection of the perimeter foundations to framed structures with outside sheeting and roofing, but no coverings over the doors and/or windows (i.e. unheated)."); Alaska Testlab Letter to NCI, January 25, 1989, at 5 ("there are several footings exposed to the weather that are not currently backfilled. They should be watched closely for excessive frost heave."); CG rapid draft letter, November 2, 1988, (Greenamyer stating that backfill was not going well because NCI "continue[d] not to protect the newly excavated material from the heavy rains...."); COR daily progress report, February 13, 1989, (Greenamyer stating that "[b]elow freezing temperatures [occurred] the last 3 nights [and the] Contractor [is] making no effort to protect foundations and slabs").

The danger of not grading properly and of leaving footings exposed was significant, given the amount of rainfall, the low temperatures, and the permeability of the soils. As

59. Brown testified that the placement of backfill would not have protected slabs-on-grade, but that allowing water near the footings permits a build up directly under the slab-on-grade and encourages frost heave.

60. Trueblood's report also states:

Another important aspect of controlling stormwater on a multiunit project is to avoid opening up more excavations than can be efficiently

protected when the weather turns sour. The easiest method of avoiding stormwater problems in excavations is to minimize their number by opening and backfilling each site as soon as possible, never leaving an excavation open any longer than necessary to form, pour and cure the foundation.

Tryck, Nyman, Hayes Report, "Civil Engineering Issues," December 27, 1994, at 8.

Nichols testified, the "soil [on the site] is permeable so any ponding water ... would contribute to the heave, or could contribute to the heave, by saturating or wetting the soils below the foundation or the slab." Trial Tr. at 1911. Brown also testified that: "The biggest problem was the water standing around the footings and that's just asking for trouble in any cold environment. It's just a perfect source for it." Trial Tr. at 2844–45. NCI could have done this type of protective backfill despite problems it was having in achieving compaction.

A Shannon & Wilson report concluded that frost heave was primarily the result of surface accumulation, rather than a subsurface source:

> Our report dated June 30, 1989 (Tab 7), and our analysis, concluded that the native fill was not a major contributor to the heave problems observed in homes built on these materials. This therefore means that ... most of the building heave had to occur due to freezing of water from direct runoff sources in existing or contractor placed fill materials.

Shannon & Wilson Report, "Differing Site Condition Analysis," February, 1995, at 5.

The potential for frost heave is well known in Alaska and on Kodiak Island, and, indeed, the contract documents warned bidders of it. The Kinney Report stated:

> The majority of soils encountered in the test pits for this investigation are considered frost susceptible.... If frost susceptible materials are exposed at the base of excavations, they should not be permitted [to] freeze after the footings are poured. Footings, floor slabs, etc. should not be placed on or over frozen ground nor should the supporting soils be permitted to freeze after construction.

> The seasonal frost penetration in Kodiak can be as much as 2 to 3-feet (unprotected areas) during winter.

Kinney Report, at 12 (emphasis added). As Nichols stated. "Frost heaving in most of Alaska is pretty common. Kodiak is quite a bit milder than many portions of the state, ... but ... its a common problem." Trial Tr. at 1898. *See also* Alaska Testlab letter to NCI, January 25, 1989, at 3 ("These problems [deep frost and subsurface water seepage] are common in Alaska, and are addressed in the soils report...."); Shannon & Wilson letter, June 30, 1989 ("The impervious frost susceptible nature of the on-site soils is also no mystery to the contractor in that the logs and soil descriptions in the Kinney foundation report are identified as 'predominantly silts and are frost susceptible.'"). In any event, as the CG points out, the rainfall [61] and temperatures [62] were not, when viewed for the project duration, unusual, given its location. Davisson, an NCI expert, stated on cross examination that there was nothing highly unusual about the moisture found in the soils on this project. Given the amount of annual rainfall on Kodiak Island, NCI should have known of the possible delay that could result if its backfill material became wet.

By backfilling footings and slabs during the winter months, NCI could have reduced the amount of water collecting around the foundations, and could have afforded somewhat better protection from the cold weather. *See* Trial Tr. at 2864 (Brown stating that "dumping even ... wet [soil] ... would have minimized or reduced the rate of frost penetration"). Even Mr. Neal testified that backfill probably would have minimized the frost heaving problem.

In sum, the court finds that NCI's own construction practices contributed substantially to the water and freezing problems it encountered.

---

**61.** According to research conducted by Mr. Brown, the CG's expert witness, the months of October, November, and December of 1988 received 10.7 inches more precipitation than normal. While rain for those months may have been above average, as Fred Brown of Shannon & Wilson pointed out, however, the average annual rainfall for Kodiak Island is 64 inches, and it actually rained 63.9 inches for the first year of the construction project.

**62.** The average monthly temperatures for November, December, and January were 2.1, 0.4, and 8.8 degrees below normal, respectively. Brown testified that January was the third coldest month on Kodiak Island in thirty years.

2. *Other problems for which NCI is accountable: subcontractor defaults, and poor performance by NCI, subcontractors, and suppliers*

A memorandum by Tom Bartlett, an NCI project manager, states that four of plaintiff's major subcontractors defaulted during the project, and that the defaults were taking a toll on NCI's management time and were impacting costs on the project. The significant problems associated with Felton alone are discussed above. The subcontractors Bartlett referred to were: Denny's Plumbing, the mechanical subcontractor; Felton Construction, responsible for the heavy earthwork and grading; David & Sons, the finish carpentry subcontractor; and, Proteam, the contractor responsible for rough carpentry. Plaintiff's current damage calculations concede that subcontractor defaults were responsible for $500,000 of its cost overruns, although Bartlett initially estimated that these four defaults alone comprised $1,837,000, or 23%, of the contract.

There were other problems with subcontractors, however. BEK, the subcontractor responsible for installing the dry wall, arrived on the project late, and, upon arrival, had planned to take more time to complete its work than was stated in its contract. NCI wrote BEK May 19, 1989, stating that it was in default for not starting work and rejecting BEK's assertion that it must be given 10 months to complete its work. BEK, in turn, asserted that it was the prime contractor's fault that it could not work. *See, e.g.,* BEK letter of August 24, 1989 to NCI (stating: "Due to your continued inability to maintain the construction schedule we were forced to leave the project again on 7/25/89 for reason of lack of work. Under your instructions that Buildings 22, 29 and garage areas in four Buildings would be ready. We returned to the project per your request on 8/21/90, to find that this was not the case.... we have not been able to complete any of the areas promised."); BEK letter of March 13, 1990 to NCI) (attributing 311 hours of delay on the project between 3/9/89 & 1/8/90 to NCI because electrical work not complete, forklift not working, lack of heat, truss problems, insulation not complete, and roof leak-

ing.) American Building Company (ABC), which eventually defaulted on its roofing subcontract, caused NCI continuous problems during construction. Judging by numerous letters sent by NCI, ABC had not been keeping up with the progress on the job site.

Adkins identified numerous instances in which the daily reports and correspondence strongly suggest that the inability of particular work crews to advance was due to a lack of available work, too much work, or missing materials. In addition, as he pointed out, poor sequencing seemed to have little to do with the alleged government-caused problems but had a direct correlation to unavailability of subcontractors.

 Contrary to NCI's suggestion, there is no proof that its problems with subcontractors is the fault of the Government. NCI has not been able to prove a disruption in its work plan, as expressed in the NAS, due to government-caused delays. Nor is there any proof that the types of problems created by the subcontractors should be traced to the CG. Quite the contrary. The difficulties NCI encountered in paying its subcontractors has to be connected with its own financial problems, which pre-dated the project. The court does not question NCI's handling of the subcontractor defaults on this project. The evidence suggests the opposite; that NCI acted promptly to mitigate any damages resulting from those defaults and absences. However, this does not remove NCI's liability for those defaults. NCI chose which subcontractors to use on this project, and unfortunately made some poor choices.

Problems with material suppliers and the delivery of materials to the site affected NCI's construction schedule as well. Spenard Building Supply provided NCI with a significant portion of the building materials, specifically the building trusses and panel walls. The incorrect and late delivery of material from Spenard, and other suppliers, slowed the progress of the project. *See, e.g.,* Proteam letter to NCI, October 5, 1988 (stating it arrived on site to commence work on September 21, 1988, and that materials were not on site); Proteam letter to NCI, December 3, 1988 (stating Spenard failed to put materials in proper order, and/or NCI placed

material package on site upside-down, which resulted in significantly slowing Proteam); Proteam letter to NCI, December 12, 1988 (stating that window trim was stacked in wrong order, making it difficult to remove and thereby slowing work); Proteam letter to NCI, December 12, 1988 (stating that gable vents arrived late, which would result in extra expense and delay to install the vents in several units); Proteam letter to NCI, February 15, 1989 (stating that specific concrete work *had* not been done, and that materials were often missing, the wrong size, or in the wrong order, and that this was impacting its ability to complete the job); Proteam letter to NCI, March 21, 1989 (stating that problems with Spenard were continuing; that they had to re-cut wall panels to fit properly, that the panels were placed out of sequence, and they were stacked on-site without proper protection).

The project lacked adequate temporary power during construction, with the result that Proteam, the framing subcontractor, was slowed and could not prosecute work according to schedule.[63] *See* Proteam letter to NCI, November 28, 1988 (stating there was inadequate power to run equipment, and that an additional power pole needed to be energized); Proteam letter to NCI, December 8, 1988 (stating Proteam was still having power problems—three generator motors had failed in 55 working days).

NCI also encountered problems with the consistency of the concrete being used on the site and with its concrete pump truck, which was often inoperable. *See, e.g.,* Krause's handwritten notes, September 2, 1988 (stating pump truck was not working and had to lay concrete by hand, and that a batch of concrete delivered by Felton was too watery and took too long to set); NCI letter, October 17, 1988 (stating concrete received from Felton was of wrong consistency and often failed slump tests). Krause testified that the lack of the pump truck "certainly did [effect the progress of the concrete foundational work]." Trial Tr. at 1283. Bill Behm, NCI's superintendent, admitted that this problem slowed NCI's foundational work.

NCI went through three construction foremen on the project. Work began with Willie Krause as NCI's on-site project manager. He was replaced because of poor bookkeeping, poor site management, and because of conflicts with Bill Behm, NCI's superintendent on the project. Neal himself testified that Krause could not keep up with paperwork or manage the job properly.[64] Krause was replaced by Richard Lundgren in early January, 1989. Lundgren stayed on the project until March 20, 1990. At that point, Reed Kent, a long time employee of NCI, took over as project manager. Kent stayed on the project until the CG took over the project on August 20, 1990.

In short, the project was plagued with an extraordinary number of problems that contributed to delay and disruption, and for which the Government is not responsible.

## DAMAGES

The court has found that NCI is entitled to prove that it suffered delay and impact damages, if any, for the following: 1) additional excavation during the foundation phase of construction; 2) a defective site drainage design; 3) a defective boiler design; 4) a large number of other minor design modifications; 5) untimely responses to clarification requests; and 6) overinspection. The court has rejected NCI's contentions with respect to other sources of alleged government-caused delay. In addition, the court has found that NCI is responsible for a substantial amount of the delay and disruption it

---

**63.** The contract specifically requires NCI to provide temporary power during construction of the project.

**64.** At trial, Neal stated:
> [Krause] couldn't or wasn't keeping up with the flow of paperwork. He was behind on all these modifications of the dirt work, behind on some of his [quality assurance] work. . . .
> . . . .

> He wasn't keeping a good enough record of these over excavations, in my view, my management view.
> . . . .
> He was falling behind in getting the estimates together. He was behind. I eventually replaced him. I didn't think that he ... [was] an effective manager for where this job was headed.

Trial Tr. at 579–80.

encountered. The issue now becomes, has the contractor proven damages with respect to the six ways in which the Government conducted itself improperly.

### 1. The modified total cost method

NCI claims that there were 76 issues or separate causes which it would have to address if it were to proceed under a direct, or actual, cost approach.[65] Accordingly, it argues that the appropriate way to calculate delay and impact damages in this case is the modified total cost method. It proposes to assume that the amount of money it spent to do the work and the amount of time it took to complete it are, if slightly modified, a valid measure of damages. It claims that it would be impossible to separate from plaintiff's total costs those additional direct costs for which the Government is responsible.

 Under the total cost method, the contractor recovers the difference between its total costs incurred in performance of the contract and its bid price. This method of quantifying damages has been approved by the Federal Circuit as a theory of last resort. *Youngdale*, 27 Fed.Cl. at 540 (citing *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed.Cir.1991) ("*Servidone II*")). "Use of this method is highly disfavored by the courts, because it blandly *assumes*—that every penny of the plaintiff's costs are *prima facia* reasonable, that the bid was accurately and reasonably computed, and that the plaintiff is not responsible for any increases in cost." *Youngdale*, 27 Fed.Cl. at 541. Thus, this method is to be used "in those extraordinary circumstances where no other way to compute damages [is] feasible...." *Servidone II*, 931 F.2d at 862.

 In light of its disfavor, the courts, as a safeguard, have developed four criteria that the contractor must meet in order to secure recovery under this approach: the impracticability of proving actual losses directly; the reasonableness of its bid; the reasonableness of its actual costs; and the lack of responsibility for the additional costs. *Youngdale*, 27 Fed.Cl. at 541 (citing *Servidone II*, 931 F.2d at 861); *see Teledyne McCormick–Selph v.*

*United States*, 218 Ct.Cl. 513, 517, 588 F.2d 808, 810 (1978) (plaintiff must prove these requirements by a preponderance of the evidence).

 The modified total cost method is simply the total cost method, adjusted for any deficiencies in the plaintiff's proof in satisfying the requirements of the total cost method. *See Servidone II*, 931 F.2d at 861. The contractor must adequately separate the additional costs for which it is responsible. If appropriate, the modified approach is used where the court finds it necessary to adjust either the contract price or the total cost of performance, or both. CIBNIC & NASH, at 715 (citations omitted). Permitting the contractor to use the modified total cost method prevents the Government from obtaining a windfall simply because the plaintiff is unable to satisfy all the elements of the total cost method. *See id.* at 862.

This case is somewhat unusual in that the contractor contends that it does not have to independently establish the appropriateness of proof of costs through direct means because the Government waived any right to object to the total cost methodology during contract performance. This contention is based upon discussions NCI personnel had with Gerry O'Hara, the Construction Division Chief for the FD & CC, and Joel Childers, the CO.

 Helene Greaves, NCI's in-house scheduler and accountant, testified that Gerry O'Hara encouraged NCI to submit a total cost claim:

> In particular, Gerry finally said to me ..., "Look, ... we want to know how much you were damaged. That, to us, is more important than anything because right now it's gone on for a long time. We'd really like to get this thing negotiated and resolved and get this contract closed out."
>
> [Gerry] said, "I understand. It's very difficult for you guys to analyze each one of these issues and we don't have the resources to analyze each one of them if you submit them as individual claims. It's

---

**65.** The original 76 items were later consolidated into 59 issues.

going to be a whole lot easier for all of us if we just find out how badly you were hurt. Tell us how badly you were hurt and then we'll have a starting point. At least we can sit down like reasonable human beings and communicate and we'll get it cleaned up and we'll generate something to that effect so that you can feel comfortable about doing it," because I specifically had real hesitations about submitting any kind of a total cost claim.

"Don't worry. We're just going to use that as a starting point for discussion. Negotiation and equitable adjustment will get this contract cleaned up and out of the way."

Trial Tr. at 2083 (Greaves). Mr. Neal testified to a similar discussion with O'Hara.[66] In March 1992, NCI received a letter from the CG stating, "once again I urge you to provide us your total price claim for all issues under this contract, or at least major portions of the issues so that real resolution can begin." CG letter of March 6, 1992. NCI contends that these communications prevent the defendant from objecting at this point to use of a modified total cost claim. The CG contends that these representations are not binding at this stage and, in any event merely express a willingness to consider a total cost claim in a settlement context; it was motivated by concern that NCI would inflate its damages by submitting numerous claims one at a time.

The Federal Circuit has stated that "once an action is brought following a contracting officer's decision, the parties start in court ... with a clean slate," and, the "contractor has the burden of proving the fundamental facts of liability and damages de *novo*." *Wilner v. United States*, 24 F.3d 1397, 1402, 1401 (Fed.Cir.1994) (*en banc*) (citations omitted). Unless the Government specifically agreed to be "irrevocably contractually bound ..., the court must still find probative evidence in the

record, *de novo*, that establishes the existence of an injury...." *Bath Iron Works Corp. v. United States*, 34 Fed.Cl. 218, 238 (1995) (rejecting contractor's argument that Navy should be bound, at trial, by an alleged agreement to use a specific methodology for quantifying claims).

Neither O'Hara's letter nor his statements explicitly or implicitly waived any rights of the Government. The court concludes that even if Mr. Neal believed that O'Hara wanted NCI to submit a total cost claim, he knew, or should have known, that this was an administrative tool to facilitate settlement and not binding on the CG if the claims proceeded to another forum. Such discussions are not the stuff of contracts. The court concludes that NCI has failed to establish the existence of a binding agreement by the CG waiving the Government's right at trial to demand appropriate proof of liability and damages. Accordingly, the court will address the four elements considered before resort to the total cost method, and, if appropriate, the modified total cost method.

### a. Reasonableness of NCI's bid

■■■ Seven contractors bid on the Lake Louise project. The range between the highest and lowest total bids, inclusive of all additive work, was approximately $1.9 million. NCI submitted the lowest bid on both the base contract, as well as the additive work.[67] While, NCI's total bid was 23.3% lower than the highest bidder, the next lowest bid was only 4.07% higher than NCI's. *See* NCI letter to CG, April 18, 1988; Adkins Report at 180. The CG requested that NCI verify its bid before award of the contract. NCI responded that its bid was correct and stated several reasons for its ability to construct the project for less than the other bidders.

At trial Mr. Neal stressed that NCI's bid was low because it is a local builder with a

---

**66.** Neal testified that
[O'Hara] said we can make an agreement, and I will have the contracting officer put it in writing to you. We need to get all this together on a one shot deal to make a global settlement, a global adjustment on a one shot deal. [O'Hara] said the contracting officer will write you and invite you. I didn't say yes at that

point. I said okay, I'll think about it. Show me the letter....
Trial Tr. at 800.

**67.** NCI's base bid was in the amount of $5,966,-913, and after additive work, its total bid was $8,141,947.

local work force, equipment, and experience. The second lowest bid was from a local bidder as well. In addition, NCI was in the final stages of the construction of a large health care facility on Kodiak Island for the United States Coast Guard. Neal explained that completion of the hospital project would result in idle personnel and equipment on the island. The Lake Louise project, therefore became available at an opportune time. Neal also testified at length regarding NCI's bid process and the extent to which he was personally involved. The court is satisfied, as the CG apparently was after NCI provided support for its bid, that NCI has established that its bid was reasonable.

### b. Impracticability of proving actual loses directly

 NCI relies on the testimony of Ms. Greaves, Jeffrey Busch, NCI's scheduling expert, Daryle Oyer, an expert in accounting and auditing, and Arthur Rounds, NCI's construction consultant, to support its assertion that it would have been impractical to prove damages by an actual cost approach and that it could not link causes to specific periods of delay.

Ms. Greaves testified that despite state of the art accounting and scheduling systems to track job costs, it would be too difficult for NCI to separate the impact and delay damages and allocate them to specific causes.[68] There were simply too many overlapping interruptions. Greaves' testimony was partial-

ly supported by both Mr. Oyer and Mr. Rounds. Oyer testified that the modified total cost approach was the "most equitable" under the circumstances, Trial Tr. at 2444, because "there probably wasn't enough hard data to try to use [the direct cost] approach." Id. at 2446. Rounds testified similarly, stating, "[a discrete analysis] could not be done with any degree of accuracy, any degree of certainty." Id. at 3705. Finally, Mr. Busch, who conducted a schedule impact analysis, allocated some days of delay to NCI, but concluded that the CG was responsible for the vast majority of the delay, assessing 246 days as CG responsibility.[69]

A plaintiff must prove that the nature of its losses makes it "highly impracticable to determine the amount of the actual losses with a reasonable degree of accuracy." Youngdale, 27 Fed.Cl. at 542 (citing Servidone II, 931 F.2d at 861). Based on the testimony and evidence presented at trial, the court finds that NCI has failed to prove this element of the test. While Ms. Greaves and Messrs. Oyer and Rounds are knowledgeable in the areas of project accounting and scheduling, the court finds that their conclusions are not sufficiently supported.

First, the conclusions reached by Oyer and Rounds do not have adequate factual support. Neither Oyer nor Rounds based his conclusion upon a personal attempt to apportion costs. Oyer based his conclusions on a list of 59 issues prepared by Mr. Bartlett.[70]

---

68. Ms. Greaves testified that

> [The system] allows us to capture our job costs and keep it in great detail, I might add, because we have to do certified payrolls and therefore we have to basically track on a daily basis and on a cost code basis all of our costs associated with labor that are both certified labor, certified payroll labor and noncertified payroll labor.
>
> All of our materials are tracked by job and by cost code and it also tracks our regular payables, company payables, regular payroll, company payroll. It generates financial statements. It does all the things that accounting systems have to do.
>
> . . . .
>
> . . . [W]e could then track [an] issue from the day that it developed until the day that it was completely closed out and make sure that we at least didn't lose it. . . . So we developed that system . . . to act as a control, . . . and, to the extent that we're able to capture costs in

those particular cost account numbers, we would capture them.
Trial Tr. at 2036–38.

69. Mr. Busch did not present an opinion as to whether or not the modified total cost approach is appropriate in this case. His expertise and analysis is limited to schedule impact analysis.

70. When his method of analysis was questioned, Oyer testified:

> I looked at the attempts to try to quantify the individual issues, and I asked that someone go through and divide those estimates into where we had discrete costs recorded, which would be the best proof.
>
> Then, where there were estimates required and whether they were what I called hard or soft estimates, you know, just how much good analytical data did we have to support the estimates? Someone took the pricing of all of

The court also notes that Mr. Oyer was not retained by NCI until November, 1994, less than ten months before trial and after NCI had already informed the CG that it was utilizing a modified total cost approach to damage assessment. As for Mr. Rounds' conclusions, the court is not persuaded that they were based upon an independent analysis either. It is clear from his testimony that he relied heavily upon amounts and calculations done by Mr. Bartlett, and others, without having checked their reliability.

Second, Ms. Greaves did not state that NCI could not allocate actual costs to their causes. In fact, Ms. Greaves explained, at great length, the systems NCI had in place to accomplish that very task, as well as two state of the art scheduling programs which NCI utilized during the project. The same documents contained within the total price claim submitted to the CO, which were prepared and presented by Ms. Greaves, illustrate NCI's ability to segregate costs on this project. Attached to this claim submitted to the CO are a compilation of discrete additional costs allocated to specific tasks, such as earthwork, concrete work, carpentry, as well as mechanical and electrical work. These costs total $3,843,546. In addition, while testifying concerning her discussions with Gerry O'Hara, the following discourse occurred between the court and Ms. Greaves:

> THE COURT: Absent that, would you have submitted a total cost claim?
>
> THE WITNESS: No. In fact, we had already begun our effort to the contrary and were derailed in the middle of it by this proposed agreement. . . .

Trial Tr. at 2083–84.

Third, the court finds the analysis prepared by the Government's expert, Mr. Adkins, to be most persuasive. He testified that NCI had in place the systems necessary to allocate specific costs to discrete causes. His analysis was thorough and persuasive. In his report he illustrates that he was able to link additional costs and delay to specific causes. While the plaintiff may disagree with the individual results of Mr. Adkins' analysis, its existence is evidence that such an analysis could be accomplished.

The court concludes that, although an actual cost allocation for this project would be difficult, NCI has failed to prove that it is impractical to allocate direct costs and impact damages, with a reasonable degree of accuracy, to specific causes. Since the elements are conjunctive and NCI has failed to establish this element of the test, this could conclude the court's analysis. Nevertheless, the court will address the two remaining elements.

### c. Reasonableness of NCI's actual costs

 The court has studied both the documentary and testimonial evidence presented by the plaintiff to support its actual costs: (1) Mr. Rounds' analysis of Mr. Adkins' report, including the breakdown of NCI's modified total cost claim; (2) NCI's original total cost claim, prepared by Mrs. Greaves, which calculates additional work performed, as well as the variances between NCI's bid estimates and actual expenditures for approximately 50 discrete tasks; (3) accounting documents, referenced by Ms. Greaves, concerning overexcavation; (4) a one-page spread sheet summary of NCI's pay requests and CG payments; and (5) a six page summary of contract modifications, NCI pay requests, and CG withholdings from those pay requests.

The two summary documents provide, at best, only limited support for NCI's claims. The summaries of NCI's pay requests and CG payments only support NCI's assessment as to the amounts actually paid to NCI by the CG. The six-page summary of contract modifications and CG withholdings from NCI pay requests is also of limited use. It only provides the court with information regarding the contract balance and monies requests and monies paid. These two exhibits fail to

---

those individual items and categorized the cost estimate into hard data, soft estimate, hard estimate or whatever.

When I looked at that, besides the fact that it came up with more than the total claim, I felt that there probably wasn't enough hard data to try and use that approach. The best thing to do would [be] just to use the total cost approach.

Trial Tr. at 2446.

support a majority of NCI's calculations contained within its modified total cost claim.

NCI relies most heavily upon the analysis performed by Mr. Rounds. His one-page spread sheet does not contain, nor does the remainder of Rounds' report contain, any support for the numbers within it. The sole explanation for this damages calculation is Mr. Rounds' testimony. Rounds admitted during cross-examination, however, that he did not independently determine a number of the amounts contained within this summary and that he had no personal knowledge as to how many were computed. Most troubling are the credits and adjustments to the total cost figure. These included: a $500,000 credit to the CG for Felton's default; a $12,000 credit to the CG for labor and materials associated with reworking prefabricated walls; a $1,700 credit to the CG for labor and materials associated with installing the building trusses; a $200,000 credit to the CG for lost, damaged, and stolen material; a $40,000 credit to the CG for damaged aluminum siding; a charge to the CG of $1,849,676 for NCI's cost of borrowing funds; a charge to the CG of $36,521 for professional services provided by Tango Construction Co.; a charge to the CG for $112,887 for professional fees associated with claim preparation; and a charge to the CG of $309,872 for an increase in NCI's worker's compensation expenses. Several of these amounts were calculated by Tom Bartlett, NCI's manager for the Lake Louise project.[71] Bartlett did not testify. While some of these amounts are credits to the CG and others are part of NCI's alleged total costs, the lack of support for these calculations places more than $3 million of NCI's modified total cost claim in question.

As the Court of Claims has previously stated, "[a] schedule of verified costs ... is not proof of damages but only a starting point...." *Boyajian v. United States*, 191 Ct.Cl. 233, 247, 423 F.2d 1231, 1239 (1970). The court has also held that "[plaintiff's costs] appear[ing] on plaintiff's damage schedule does not by itself amount to probative evidence in the absence of anything else...." *Id.* (quoting *Roberts v. United States*, 174 Ct.Cl. 940, 949, 357 F.2d 938, 944–45 (1966)). NCI has provided the court with little more than a mere schedule of damages and credits to the CG. Therefore, NCI has failed to establish that its total costs figure is a reliable point of departure.

### d. Lack of responsibility for additional costs

■ There is a more important reason that even a modified total cost approach is unworkable here. As stated earlier, this project suffered from many separate, but concurrent, problems that hampered NCI's progress during construction. NCI claims that the vast majority of the delay and extra costs has its origin in government fault for several reasons. The court has rejected several of those reasons. The Government, on the other hand, has proven that a significant portion of the problems occurring on the project were the result of inferior work performed by NCI's subcontractors, various subcontractor defaults, problems connected with NCI's procurement of materials and supplies, and poor on-site management. As Adkins demonstrated, even if NCI's plan were corrected with respect to crew restraints, logic and timing of certain functions, it probably would have finished late, given the resources utilized. For the project to have any likelihood of finishing on time, there had to be a high degree of efficiency in each work crew getting access to its assigned task on time. Because the work involved repetitious tasks performed in a particular order on thirty buildings, generally by single crews, each follow-on task had to be started

---

**71.** An example of the Rounds' reliance on numbers generated by others is best expressed by his testimony regarding the $40,000 credit to the Coast Guard for damaged aluminum siding. He stated, "The calculation is based upon Mr. Bartlett's representation to me that KEA's damage to the site ... [is] about half of the damage and should be about $40,000.00." Trial Tr. at 3727. When questioned further, he adopted his deposition testimony that "[t]here was an overrun with regard to aluminum siding and [Bartlett's] assessment was that about half of it was attributable to damage and half of it was attributable to other issues. And, so, he allocated that the overrun was just under $80,000.00. And, so, he said half of it was $40,000.00." *Id.* at 3727–28 (Rounds).

on time and diligently pursued. Under those circumstances, it is no surprise, that there was delay, given NCI's problems with its subcontractors and suppliers. At a minimum what this means is that the total cost approach cannot be used. NCI concedes the point, however, and seeks to modify the total cost approach by taking out costs associated with its own fault.

A modified total cost approach assumes that the elements of a total cost claim fundamentally have been established, but that adjustments must be made, for example, because the contractor is partially at fault. Assuming those are the facts and assuming the court has some degree of confidence in its ability to quantify contractor fault, then there should be no reason to abandon altogether the total cost method. However, those are not the facts here. The only element of the total cost method in which the court has any confidence here is the first, namely that NCI's bid was reasonable. The plaintiff has not proven that direct costs could not have been utilized; the court has no confidence in NCI's total cost figures; and, the court has found that NCI is responsible for a significant amount of the delay and disruption.

Moreover, even if the other three elements were established, the court is faced with figures from NCI as to contractor fault that it believes are seriously understated. As mentioned above, Mr. Adkins' analysis draws into serious question several of the "credit" items contained within Rounds' one-page summary. A significant disagreement exists as to the additional cost incurred by NCI as a result of the defaults of the various subcon-

tractors, as well as the disagreement regarding the appropriate daily rate for overhead. Adkins concluded that NCI incurred a loss of $1,399,090 as a result of subcontractor defaults.[72] Of this amount, he attributes $612,309 to Felton alone. This is in stark contrast to NCI's sole allocation of $500,000 for Felton's default, assessing no other costs for additional subcontractor defaults. The court also notes that NCI's original claim, as submitted to the CO, assessed in excess of $1.4 million to NCI just for costs associated with the completion of Felton's earthwork. The court finds Adkins' analysis to be more persuasive given the level of detail of his report, as well as the court's view that Rounds' conclusions are insufficiently supported.[73]

Even Adkins, however, did not attempt to quantify the more serious issue of the extent to which NCI's overall difficulties with drainage and glaciation were attributable not to the CG but to itself. In sum, only one element of the modified total cost method is established. The plaintiff offered no other means to extract impact or disruption costs. The court is thus forced to determine as best it can from actual data a reasonably correct approximation of the extent of delay and extra costs that resulted from the CG's actions.[74] *See Youngdale,* 27 Fed.Cl. at 546 (quoting *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 199, 351 F.2d 956, 969 (1965)).

### 2. NCI's proof of direct costs

It is required that NCI directly link specific costs, as well as discrete delay and impact damages, to each particular instance of alleged government liability. As this court

---

72. Adkins calculated this amount by subtracting the amount paid to the defaulted subcontractors from the amount needed to complete the defaulted subcontractors' work. The court finds this to be a reasonable method.

73. The sole document NCI presented to support its allocation of $500,000 to the Coast Guard for Felton's default is a letter sent to NCI's attorney which was prepared for Seaboard Surety by its legal counsel. This calculation does not come with support sufficient to allow the court to rely on it when it was not prepared by NCI, nor was the individual who prepared it presented to explain it.

74. In order for the delay of a particular activity to be compensable (aside from direct costs), the activity must be on the contractor's critical path, or, in other words, the delay must exceed the available float, or extra, time for that particular activity. *Broome Constr., Inc. v. United States,* 203 Ct.Cl. 521, 528, 492 F.2d 829, 833 (1974); *Youngdale,* 27 Fed.Cl. at 550; *G.M. Shupe, Inc. v. United States,* 5 Cl.Ct. 662, 728 (1984). In addition, the contract states that "The Contractor will not be entitled to an extension of time under this contract unless the delays, for which an extension of time is required, exceed the float time along the paths of the activities containing float time." Contract § 01310–6, ¶ 1.2.3.

has stated: "It is for the plaintiff to show, by probative evidence, *which* separate causes by the government result in *which* identifiable periods of delay, before it can be said that plaintiff has carried its burden with respect to causation." *Weeks*, 13 Cl.Ct. at 240 (citing *Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed.Cir.1984)). Additionally, where the court cannot extricate specific CG caused damages and impact from those for which plaintiff is responsible, plaintiff's claim must fail in its entirety. *Youngdale*, 27 Fed. Cl. at 546 ("[w]here both parties contribute to the delay neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each party") (quoting *Klingensmith*, 731 F.2d at 809 (citation omitted)).

Because NCI presented its claims in a modified total cost approach, it did not put on evidence of direct costs associated with specific items of government responsibility. Adkins, on the other hand, attempted to isolate costs for each of the 57 items plaintiff originally assessed against the Government. As explained above, he was able to do so. He found $36,814 in additional direct costs for which the Government is liable. Adkins included in that figure amounts for some minor items which are not the subject of a specific finding by the court of government liability. The court will treat his figure as a minimum. As to several other items, such as overexcavation, NCI has been paid its direct costs.

There were a few other items for which NCI has not been paid its direct costs, and that are not included in Adkin's figure. He did not, for example, include any direct costs, although he was able to verify them, for site water problems. This included the costs of professional advice sought by NCI. For lack of any more precise way to allocate responsibility for those costs in connection with the grading plan, the court will assess half, $31,264.00, against the Government.

Another direct cost not included by Adkins was the cost of repairing or maintaining the undersized boilers, $52,868.00. Although Adkins reflects that only $7,092.00 was captured

by NCI in the relevant job cost series, that does not appear to be the reason he rejected the larger amount. He opined that it was an item of contractor fault. The court has found to the contrary. Accordingly, the larger amount is included.

The court assesses $120,946 against the Government for direct costs, plus home office overhead and profit.

### 3. Delay

There were a total of 278 calendar days of overrun. Modification No. 35 assessed liquidated damages based on that overrun in the amount of $77,840.00. Modification No. 35 (contract documents, September 11, 1990). This was based on $280.00 per day for 278 calendar days, November 14, 1989 through August 20, 1990.[75] NCI claims about 1,450 days of compensable delay associated with over fifty separate items of government fault. The days are totaled with no attempt to eliminate concurrency, however.

The contract precludes a request for additional time unless the contractor can demonstrate that the delay at issue exceeded "float" time for a particular critical path item. Helene Greaves conceded that the claim request for additional time was not prepared in a way to demonstrate such a loss of float time. In view of the deficiencies in the NAS schedule, this is not surprising. It would have been virtually impossible to show a loss of float time, given the fact that the lack of crew constraints resulted, until late into the contract, in virtually nothing on the critical path except excavation. To bridge this gap, the plaintiff offered the testimony and exhibits of Jeffrey Busch. Although the court is satisfied as to Mr. Busch's qualifications to do a scheduling analysis, it has no confidence in his attributions of delay in this case as between NCI and the CG. His testimony was unconvincing for several reasons.

The court has carefully studied Busch's exhibits and reconsidered his testimony, yet it comes away from that exercise with no clear understanding of what it is he did. The

---

**75.** Modification No. 35 based liquidated damages on 278 days while the CG's expert analysis conducted by Adkins used 279 days. The court will use 278 since that is the amount which NCI was actually charged by the modification.

ultimate conclusions are clear enough—he attributes virtually all impact and delay to the CG. But how he got to that result is not nearly as transparent as Adkin's analysis. Although he did an as-built analysis, it seems clear that he did not re-do the entire as-planned logic with crew constraints so as to have a base from which to measure impact on critical path. The cumulative delay shown on Plaintiff's Exhibit 827 does not appear to have been based on any critical path analysis.

Busch's assumptions about causes of delay are also inconsistent, at least in substantial part, with the court's view of the facts. He testified, for example, that, based on the original NAS, the project had lost 100 days of float between August 1988 and January 1989. Setting aside the problem that the original as-planned schedule could not meaningfully be used to make such a conclusion, he assigns that loss of time to KEA's problems and overexcavation. He furnishes no support for that conclusion, and in any event it simply does not ring true. NCI was as responsible as KEA for delaying the completion of the roadway. As discussed above, the court found Adkin's reconstruction of the critical path more coherent, particularly in connection with the overexcavation issue. Busch attributed virtually no delay to Felton, and that which he found was concurrent. This is simply not credible. Busch did not include Spenard's mis-stacking of materials as "a significant event." Nor did he attribute to NCI any of the delay BEK experi-

enced in keeping up its work. He did not treat NCI's obligation to provide temporary heat as relevant in that respect. In short, Busch's documents are summary and conclusory, as was his testimony, and they make virtually no allowance for NCI fault.

Adkins did a detailed analysis of each claimed delay and concluded, in light of his reconstructed as-planned schedule, that virtually none of those claimed events of delay actually impacted the critical path of the work. As explained above, his analysis is considerably more persuasive than that offered by NCI. Adkins concluded that 143 days of the delay were excusable. Of this amount, he found that 63 calendar days were also compensable (i.e., due to government fault). Adkins' figures included the nine calendar days of delay caused by overexcavation.[76] That delay arises from a differing site condition, is thus treated as due to government fault, and is therefore compensable.

NCI associates 240 days just with drainage problems. Adkins made no effort to quantify delay associated with this element of plaintiff's claim. It is not one of the items he considered appropriate to assess to the Government. The court is persuaded, however, that the excessive water on the site, caused, in part, by the poor site drainage design, impacted NCI's construction sequencing. Even Adkins demonstrated that NCI experienced significant delay during the winter of

76. Plaintiff called Arthur Rounds, a construction consultant, to answer Adkin's arguments at several points. His refutations were conclusory and simplistic. Delay attributable to unsuitable soils is an example. His sole response to Adkin's detailed analysis is contained in the following exchange:

Q. Do you have any opinion about [whether overexcavation had a major impact on the project]?
A. I don't agree with his conclusion.
Q. What is the basis for that opinion?
A. Well, I think the issue of unsuitable soil goes way beyond the discrete sampling that was taken at the time. The removal was kept to a minimum. The removal did not eliminate the overall problem of the unsuitable soils on the site. It simply corrected a locational problem so that footings could be poured.

But Neal continued to have to deal with this unsuitable material in one marked manner or another for the remainder of the project. I

believe it was Mr. Kinney's report that suggested that some 23,000 cubic yards of unsuitable [soil] will be removed from the site.

When you compare that recommendation to the amount of material that was removed from under footings, it pales in comparison. I mean the problem continued to impact Mr. Neal. Trial Tr. at 3682–83. It is not at all clear what Mr. Rounds is referring to at this point. NCI is not making a claim for the physical problems associated with unsuitable materials, except in connection with delay and impact caused by the overexcavation. Mr. Rounds has no geotechnical expertise.

His disagreement with Adkins over the impact of defaults was based solely on the facts that Adkins conceded Dennys Plumbing did a good job, and that, under the difficult circumstances, NCI acted as a prudent contractor. None of this addresses the real problems associated with subcontractors and materialmen, but illustrates the superficiality of his testimony.

1989, after foundations were largely complete. The court is satisfied that much of the delay after June of 1989 was due to subcontractor and supplier problems, but a portion of the delay up to that point should be assessed to the Government. There is no compelling way, given the partial overlap of non-compensable causes, to segregate how much delay should be associated exclusively with the poor site design (as well as other government fault). For lack of any better way to extract this figure, the court will assign thirty days. The number of days plaintiff claims for drainage problems (240), represents approximately 20% of the total delay days it alleges (1140). When that percentage is applied against the total amount of project overrun (279 days) the proportionate amount for drainage and freezing problems is approximately 60 days. The court will split between the parties the liability for that amount of delay.

NCI claimed that it suffered approximately 670 days (non-concurrent) of delay in connection with specific items other than those related to excavation, drainage, concrete or utilities. The court places no reliance on NCI's claimed days, first because they exceed the areas of liability found, second because they are non-concurrent, and third because they were not individually supported. Adkins carefully examined each of the claimed delays in connection with design changes, arriving at his figure of 63 compensable days. These include items for which no specific liability is found in this opinion, so the court will treat his totals as a stipulated minimum amount.

Of the items not allowed by Adkins, NCI claims a total of 41 days in connection with boiler shutdowns. Adkins disallowed this amount because it could not be established that it interfered with the critical path of the work. There is no clear evidence to the contrary. The same is true of the individual design modification orders and the dispute over weather stripping.

The court is satisfied that the CG should share part of the blame for the limping conclusion to the contract because of its overzealous inspection after substantial completion. According to a report by Contract Management Specialists, a consultant hired by NCI, work was substantially completed by May 11, 1990. Reed Kent testified that all the legitimate punch list items could have been completed by the end of May. Beneficial occupancy began on June 8, 1990. The court will treat June 1, 1990 as the date of substantial completion. Only legitimate final touchup items should have been on the critical path at that point. The court is therefore less reticent to find delay. NCI would have been released at that point but for the seemingly endless punch list items. As the court has found previously, although there were many legitimate items on the punch list, it is left with the ultimate impression that the inclusion of some items was unnecessary, as was the retention of others. The whole process of beginning with "deficiency" lists before final punch lists were even due under the contract had the effect of camouflaging what really needed to be done, added to the friction between the parties, and forever obscures whether the CG was really justified in bringing on completion contractors. Neal was "locked out" of the units on a seriatim basis beginning on June 8th. Yet the follow-on contractor was not brought onto the site for another forty five days. Accordingly, the court assesses against the Government half of the time between June 1, 1990 and August 20, 1990, or thirty six calendar days, as compensable delay.

No additional delay days are awarded or excused. NCI has therefor demonstrated that a total of 209 days are excused, of which 129 are compensable. The court accepts Adkin's analysis on extended job overhead ($1,152 per day) and will use the CG's percentage for home office overhead (7.5%), although it believes that a reasonable profit is 10%.

## 4. Over-withholdings, liquidated damages, and the counterclaims

The contract amount, after all CG modifications, is $7,897,664.07. NCI has received payments from the CG totaling $7,749,031.94. Assuming no justification for the retainage, the CG is responsible for the shortfall of $148,632.13. The CG makes certain affirmative claims, however.

### a. Liquidated damages

The contract completion date for the project was November 14, 1989. This date remained unchanged throughout the project.[77] The court has concluded earlier that 209 of the delay days should have been excused. The contract completion date should therefor be changed to June 1, 1990. Modification No. 35 deducted $77,840.00 from NCI's contract pursuant to the contract's liquidated damages clause at a rate of $280 per calendar day. $58,520 should therefore be returned to NCI as over-withheld liquidated damages.

### b. Topsoil

The CG claims that NCI failed to place the proper amount of topsoil on the site, as required by the contract specifications.[78] The CG claims that the inadequate depth of topsoil resulted in poor growth of grass on the site. In May, 1990, Shannon & Wilson, the CG's geotechnical firm, sent Steff Browne to the site to measure the amount of soil placed on the site. At this time, the topsoil had already been laid, and the grass seed and mulch compound had already been placed on top of the soil. Browne went to the site, dug holes in selected locations, and measured the thickness of the layer of topsoil based upon his visual observations. According to his testimony at trial, Browne determined where the topsoil layer ended based primarily upon color.[79] From his measurements, Shannon & Wilson concluded, "that the topsoil thickness ranges from 0 to great-

er than the 4–inches required by the contract specification. Based on the 97 data points, the average thickness of the topsoil at the Lake Louise project is only 2.4–inches [which is] about 60 percent of that required by the contract...." Px 779, at 2 (Shannon & Wilson Top Soil Report, June 5, 1990).

NCI disputes this allegation, stating that it covered the site with suitable soil, obtained from the site, as well as from an outside source, in the depths specified by the contract.[80] In addition, it was Mr. Neal's position at trial that the grass problems experienced at the site are the result of insufficient fertilizing by the residents. He stated that the heavy rain washes away fertilizer, making it necessary to repeat the process.

The record is insufficient to find that NCI did not supply the proper amount of topsoil. In addition to the evidence that lack of fertilizer played a role in the poor grass growth, the court has reservations concerning the conclusions of the Shannon & Wilson report. First, testing conducted six months after at least a portion of the topsoil had been placed is of limited value.[81] As Scarborough explained, over time, soils will settle, compact, and be carried away by rain.[82] Second, the Shannon & Wilson conclusions were based upon visual observation of the coloration of the soils. This seems a dubious method given that at least some of the topsoil was

---

77. It was not until NCI's completion of the contract and submission of several claims to the CO, that the CO modified the completion date, to December 2, 1989, adding 18 days for severe weather.

78. The contract required the depth of the topsoil to be either 2, 4, or 6 inches depending upon the location. Contract § 02480–14, ¶ 3.2.3.

79. Browne testified, "topsoil tends to be a darker colored material. And if I recall correctly, it was a darker colored material than the native soil." Trial Tr. at 4238.

80. The contract permitted the use of on-site soils for topsoil, so long as they were of suitable material. See Contract § 02102, ¶ 3.6. On-site material was tested by Cooperative Extension Services and approved by the Coast Guard.

81. While the court is unclear as to exactly when all the topsoil had been placed, it is apparent from Greenamyer's records, as well as trial testimony, that some, if not all, of the topsoil had been placed during the summer and fall of 1989. Mr. Browne did not test the soils until the following spring, in May 1990.

82. This is especially true on Kodiak Island where there is a great deal of rain. Thomas Scarborough, a civil engineer, testified for plaintiff, stating, "[the topsoil] was put in the summer and fall of 1989. Kodiak has a lot of rain. The water washes the fines out of the topsoil, ... [w]e're talking about material that will pass through a 200 sieve, ... [it] will actually suspend itself in water." Trial Tr. at 4306.

native to the site, possibly making the colors less distinct. In addition, there was a suggestion at trial that soils may appear darker if wet. Browne stated that he could not remember whether the soils were wet or dry when he performed his measurements. Thus, the court denies the CG's claim for additional costs associated with site topsoil.

In addition, the court finds that NCI is not responsible for the costs incurred by the CG for testing the topsoil. Modification No. 30 cites only to FAR § 52.246–12 as support for the assessment of costs for inspection of the topsoil. Modification No. 30 (contract documents, June 14, 1990). This section, however, only provides the Government with testing costs where "work is not ready at the time specified by the contractor for inspection or test, or when prior rejection makes reinspection or retest necessary." FAR § 52.246–12(e). Neither case is present here. Therefore, in the absence of any other support provided by the CG, Modification No. 30 is invalid and NCI is entitled to the return of $4,100. *See* Modification No. 30 (contract documents, June 14, 1990).

### c. *Punch-list items, and other CG withholdings*

Emerald Maintenance completed certain contract work after NCI left the project. The CG withheld $258,364.00 ($147,860 for interior work and $110,504 for exterior work).[83] The CG contends this work was performed in order to complete and repair work that was part of NCI's contract. Mr. Neal testified that the work was substantially completed when NCI was removed from the project on August 20, 1990. He stated that the remaining items on the punch list were either not NCI's responsibility or not legitimate. In a letter dated August 13, 1990, NCI wrote, "We have completed all punch-list work. We know of no significant items of uncompleted work on any unit you have taken over for occupancy." NCI letter, August 13, 1990. And, in a letter dated August 20, 1990, the day NCI was removed from the project, the contractor wrote:

> Again we are writing you about your puzzling comments regarding punch-lists and work on the punch-lists which you allege we have not completed. We have completed the punch-lists given to us and you have taken possession of the units. We have received no notice from you that any item on the punch-list has been unacceptable to you.

The CG response was not helpful:

> There is no requirement that I advise you of incomplete punch-list items, after you have your allotted 10 days to complete. Further, I advised you on 14 May 1990 and again on 28 June 1990 that I would specifically not be getting back [to] you to advise you of incomplete items but would be seeking other means to complete the work.

CG letter, August 31, 1990.

A letter written in November of 1990 states that, while interior work was substantially complete, the CG planned to contract out for the exterior work in the spring, unless it was notified that NCI would finish the work. This was three months after NCI had been ordered off the site.

The court has a number of difficulties with defendant's effort to have amounts paid to Emerald assessed against NCI. Initially, as

---

83. *See* Modification No. 32 (July 26, 1990) (deduction of $10,160 for interior punch-list items on units 1–8) and associated Emerald Maintenance documents associated with Modification No. 32; final inspection punch-list for Emerald Maintenance, August 3, 1990; Modification No. 33 (August 9, 1990) (deduction $35,500 for interior punch-list items on units 9–14 & 18) and associated Emerald Maintenance documents; final inspection punch-lists for Emerald Maintenance for units 9–12, 13–14, and 18, August 31, 1990; Modification No. 34 (August 10, 1990) (deduction of $44,800 for interior punch-list items on units 23–30) and associated Emerald Maintenance documents; final inspection punch-list, for Emerald Maintenance for units 23–26, and 27–30 (September 14, 1990); Modification No. 36 (September 17, 1990) (deduction of $57,-400 for punch-list items on units 15, 16, 17, 19, 20, 21, & 22) and associated Emerald Maintenance documents; final inspection punch-lists for Emerald Maintenance on units 15–17, 19–21, and 22, 9/28/90); Modification No. 39 (August 10, 1990) (deduction of $110,504 for exterior punch-list items on all units) and associated Emerald Maintenance documents.

explained earlier, the court is persuaded that there were items on the list which should not have been there, or that stayed on the list too long. The punch lists themselves were the subject of a desultory defense by the Government. Moreover, although the court has not allowed any delay in connection with the weather stripping or boiler problems because there was lack of proof of impact on critical path, it is satisfied that those problems caused some of the difficulties NCI had as a result of cold temperatures and moisture. Deficiencies associated with moisture and temperature, such as poorly fitting moldings, appear on the punch lists. The weather stripping itself, although it was a design problem, continued to appear on the lists. Moreover, the follow-up work was awarded in phases, with limited initial, and no subsequent competition. The counterclaim as to Emerald Maintenance payments therefor fails for lack of proof.

Four modification orders do not concern punch-list work, however. They are numbers 29, 30, 37 and 38.[84] Modification No. 29 deducted $1,401 from NCI's contract for costs associated with the project manager's trip to Kodiak Island to inspect the project when it was not in fact ready for inspection. According to Mallahan, the project was not ready for final inspection on the date which NCI had so informed the CG. *See* NCI letter, May 15, 1990 (stating all the units would be ready for final inspection on May 22, 1990). The CG has shown that it incurred costs because of NCI's failure to have the project available for final inspection on the date NCI itself had chosen less than 10 days earlier. *See* 48 C.F.R. § 52.246–12. Thus, Modification No. 29 remains part of the contract. Modification No. 30 was dealt with in connection with topsoil. The validity of Modification No. 37 has not been established by the CG, and the CG has acknowledged that it failed to provide support for this modification at trial. NCI is therefore entitled to the return of those funds, $3,780.10, which were withheld by the CG. The CG has, however, established its entitlement to withhold money pursuant to Modification No. 38. The CG withheld $1,460 in order to replace a damaged bathtub. Robert Mallahan, a CG project manager, testified that the tub had to be replaced because a sharp object had been left beneath the bathtub during installation. Therefore, the court concludes that the contract balance should only be reduced by $2,860 for these amounts.

## CONCLUSION

Based on the findings and conclusions above, the court sustains only those portions of NCI's claim accepted herein. The Government's counterclaim is rejected. Accordingly, NCI is entitled to damages calculated in the manner shown in the appendix. The Clerk is directed to enter judgment for plaintiff in the amount of $792,143.83 plus interest from October 1, 1992 at the Contract Disputes Act rate. 41 U.S.C. § 611. Each side to bear its own costs.

Appendix
## DAMAGES CALCULATION

| | | |
|---|---|---|
| Contract Balance | | $148,632.13 |
| Improper Withholdings | | $266,244.10 |
| Partial Return of Liquidated Damages | | |
| Amount withheld for 278 days: | $ 77,840.00 | |
| less actual CG entitlement: | ($ 19,320.00) | |
| | | $ 58,520.00 |
| Direct Costs | | $120,946.00 |
| Home office overhead at 7.5% | $ 9,070.95 | |
| Profit | $ 13,136.00 | |
| | | $143,018.64 |

84. Modification No. 30 has already been discussed by this court in connection with the topsoil requirements and testing.

Appendix—Continued

Damages for compensable delay
 extended job overhead
 129 days × $1,152 $148,608.00
 home office overhead
 $148,608 × 7.5% $ 11,145.60
 profit
 $159,753.60 × 10% $ 15,975.36

 $175,728.96

 $792,143.83